[Crim. No. 22039. Sept. 19, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
RAYMOND RUDY CHAVEZ, Defendant and Appellant.

824

**COUNSEL**

Jonathan M. Purver, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Edmund D. McMurray and Ward A. Campbell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LUCAS, J.**—This automatic appeal follows a judgment imposing a penalty of death pursuant to the 1978 death penalty law. (Pen. Code, § 190.1 et seq.; all statutory references are to this code unless otherwise indicated.)

An information was filed in Tulare County Superior Court charging defendant Raymond Rudy Chavez with the following offenses occurring on August 26, 1979: the murder of Joseph Mossa (count I, § 187) and the robbery of Mossa (count II, § 211). The information alleged as a special circumstance that the murder charged in count I was committed while the defendant was engaged in the commission of the robbery alleged in count II. (§ 190.2, subd. (a)(17)(i).) Finally, the information alleged that, as to both counts, the defendant personally used a firearm. (§ 12022.5.)

Defendant entered a plea of not guilty to each count and denied the special circumstance and firearm allegation. The jury found defendant guilty on both counts, found the special circumstance to be true, and found the firearm allegation to be true as to both counts. That same jury was unable to reach a verdict in the penalty phase, but a second penalty jury returned a verdict of death. Appeal to this court is automatic. (§ 1239.)

## I. FACTS

At approximately 3 a.m. on August 26, 1979, decedent, Joseph Mossa, and his wife drove away from their house at the beginning of a vacation to be spent at Lake Tahoe. As they drove, a car followed them and another pulled in front of them. The cars carried defendant, his brother Tony, and their friends, Gary Hook, Art Aguirre, and Ignacio Pelaiz. The front car stopped and the rear car boxed in the Mossas' car. Defendant jumped from the rear car and walked to the driver's window of the Mossa car. Mr. Mossa, who was at the wheel, rolled down his window and asked defendant what he wanted. The defendant pointed a gun at Mossa and demanded, "Give me your bread." When Mossa asked what he meant the defendant said, "Give me your valuables." Mossa complied by handing over his wallet. After looking through the wallet defendant said, "Where is the rest?" As Mossa tried to turn his steering wheel to drive away, defendant shot Mossa in the head, killing him instantly. The car jumped the curb into a vacant lot and struck a tree. Defendant and his cohorts sped away while Mrs. Mossa got out of her car and ran to a nearby house to call the police.

Pelaiz testified that before the shooting the defendant and his friends had been drinking and smoking marijuana for about 10 hours. He further testified that, after the shooting, the cars drove to Aguirre's house where de-

fendant and Aguirre divided the money in Mossa's wallet. Pelaiz received $9.

The defense was based entirely on the theory of diminished capacity. Defendant did not testify.

## II. Guilt Phase Issues

### A. *Jury Selection*

Defendant raises two issues relating to the voir dire and selection of the jury. First, he argues that the excusing for cause of veniremen who would automatically vote against the death penalty but whose views would not affect their ability to judge defendant's guilt or innocence (so called, guilt phase includables) resulted in a guilt phase jury that was conviction prone and was not a fair cross-section of the community. Second, he claims that the People peremptorily challenged all veniremen who expressed any doubts about the death penalty (so called, death-scrupled veniremen) and that such conduct violated the mandate of *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].

1. *Jury conviction prone and not a fair cross-section.* Defendant's claim that exclusion of the guilt phase includables resulted in a conviction-prone jury was considered and rejected by us in *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301]. His assertion that the absence of guilt phase includables denied him a jury composed of a cross-section of the community was considered and rejected in *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680]. We decline to reconsider the holdings of those cases.

2. *Wheeler error.* In *People* v. *Wheeler, supra,* 22 Cal.3d 258, we held that the People may not systematically use peremptory challenges for the sole purpose of excluding members of an identifiable group distinguishable on racial, religious, ethnic, or similar grounds. Defendant asserts that death-scrupled jurors are such a group and that the People systematically excluded them by peremptory challenges in this case. We considered and rejected these arguments in *People* v. *Turner* (1984) 37 Cal.3d 302, 313-315 [208 Cal.Rptr. 196, 690 P.2d 669].

### B. *Expert Testimony*

Dr. Morrison, a medical doctor specializing in pathology, testified as an expert witness for the People. His testimony during the case-in-chief was related to the autopsy he performed on Mr. Mossa and was not challenged

by defendant. Dr. Morrison was later called in rebuttal and testified, over defense objection, that a person who performed the acts ascribed to defendant would have the requisite intent to commit robbery regardless of whether such person had been drinking or was drunk. He further testified that the performance of those acts would be inconsistent with the evidence that such a person had consumed the amount of alcohol alleged to have been consumed by defendant. Defendant challenges the admissibility of the rebuttal testimony, asserting that Dr. Morrison was not qualified as an expert in the area in which he testified on rebuttal.

Evidence Code section 720, subdivision (a), allows a witness to testify as an expert "if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." We last addressed this issue in *People* v. *Hogan* (1982) 31 Cal.3d 815 [183 Cal.Rptr. 817, 647 P.2d 93]. ■ There, we explained that an expert's qualifications "must be related to the particular subject upon which he is giving expert testimony. Qualifications on related subject matter are insufficient. [Citations.]" (*Hogan, supra,* at p. 852.)

In *Hogan,* a "criminalist" who could properly testify that certain stains were blood and could identify the blood type was permitted to testify whether the blood had been spattered or transferred by contact. The criminalist's qualifications on the issue of the source of the stains were that he had once viewed an exhibit on the subject, had read a book "some years prior" about flight patterns of blood (although he was neither very familiar with the book nor had he relied upon it in forming his opinion), and had viewed bloodstains at many crime scenes. He further admitted that he had performed no tests on the stains involved in the case nor did he have any standards to which to compare the stains. We held that admission of the criminalist's testimony of the origin of the stains was error.

■ We are required to uphold the trial judge's ruling on the question of an expert's qualifications absent an abuse of discretion. (*Hogan, supra,* 31 Cal.3d at p. 852.) Such abuse of discretion will be found only where " 'the evidence shows that a witness *clearly lacks* qualification as an expert . . . .' " (Italics in original, *ibid.,* citing Jefferson, Cal. Evidence Benchbook (1972) § 29.3, p. 502.) ■ Here, Dr. Morrison's testimony showed that he was a medical doctor with extensive experience in forensic pathology. He had analyzed the results of between 500 and 600 post mortem blood alcohol tests and related those results to the circumstances surrounding death. He also indicated that he knew of the extensive medical literature dealing with alcohol and behavior. He admitted that most of his professional experience had been with dead bodies rather than live persons and that he

had no professional experience in estimating blood alcohol based upon the actions of a live person.

Although the matter is not entirely free from doubt, we conclude that Dr. Morrison was qualified to give expert testimony on the issue of alcohol. In *Brown* v. *Colm* (1974) 11 Cal.3d 639 [114 Cal.Rptr. 128, 522 P.2d 688], we held that a physician could testify as to the standard of medical care that prevailed in the community in 1949 even though he did not engage in the practice of medicine until 10 years later. We found dispositive the fact that the witness had made a study of the standard of care in 1949 in preparation for his testimony. Similarly here Dr. Morrison testified that he knew of the medical literature on alcohol and its effects. On the whole, then, we cannot say that Dr. Morrison "clearly lacks" the requisite qualifications and we therefore conclude that the trial judge did not abuse his discretion in permitting Dr. Morrison's rebuttal testimony.

Defendant's challenges to Dr. Morrison were properly treated by the trial judge as going to the weight of the testimony. After a review of the trial transcripts, we are satisfied that the nature and extent of Dr. Morrison's experience was made clear to the jury. The jury was instructed that it was the sole judge of the weight to be given to any witness' testimony, that it could consider the qualifications and credibility of an expert and could disregard any expert opinion. In light of these facts we are satisfied that the jury was fully capable of properly evaluating Dr. Morrison's rebuttal testimony.

Finally, any error that may have occurred by the admission of Dr. Morrison's rebuttal testimony was cured by the testimony of Dr. Berkson, who testified on rebuttal immediately after Dr. Morrison. Dr. Berkson was qualified as a medical doctor specializing in psychiatry. He substantially corroborated the opinion given by Dr. Morrison and defendant does not challenge Dr. Berkson's credentials or testimony.

### C. *Jury Instructions*

The court gave certain instructions regarding accomplice testimony as a consequence of Ignacio Pelaiz' testimony for the prosecution. In particular, the court gave an instruction (CALJIC No. 3.11) to the effect that the testimony of an accomplice needs corroboration.[1] Defendant alleges that that instruction, which is a restatement of section 1111, was undermined by

---

[1] "A defendant cannot be found guilty based upon the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense."

CALJIC No. 2.27 which allows the jury to find any fact on the testimony of only one witness.[2] Defendant supports his argument by citing the Use Note to CALJIC No. 2.27 which in turn was derived from our decision in *People* v. *Rincon-Pineda* (1975) 14 Cal.3d 864 [123 Cal.Rptr. 119, 538 P.2d 247, 92 A.L.R.3d 845], in which Chief Justice Wright stated that the equivalent of No. 2.27 "should be given in every criminal case in which no corroborating evidence is required . . . ." (P. 885.) The court herein refused to instruct that Pelaiz was an accomplice as a matter of law, and because the jury made no special finding on this question, we cannot know whether it considered Pelaiz an accomplice. Defendant argues that the net effect of Nos. 2.27 and 3.11 was to permit the jury to convict based solely on the testimony of Pelaiz.

Defendant failed to object at trial to either instruction nor did he request the trial judge to modify No. 2.27. Although the People argue that this conduct constitutes waiver, section 1259 allows us to "review any instruction given . . . even though no objection was made thereto . . . if the substantial rights of the defendant were affected thereby." The corroboration requirement of section 1111 is a substantial one and we therefore consider defendant's argument.

■ The People argue that Pelaiz was not an accomplice and hence if the jury, under No. 2.27, accepted his testimony without corroboration no error resulted. An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial . . . ." (§ 1111.) The record reflects that Pelaiz owned the gun used by defendant, he gave the gun to defendant en route to the crime, and he received proceeds from the robbery. Pelaiz was originally charged with first degree murder and robbery and eventually pleaded guilty to being an accessory. While none of these facts makes Pelaiz an accomplice as a matter of law, they are sufficient to justify the accomplice instructions which were given. We hold that the jury could have found Pelaiz to have been an accomplice. On that basis we reject the People's argument that the accomplice instructions were superfluous and that any conflict between CALJIC Nos. 2.27 and 3.11 was therefore illusory.

■ Turning to the merits of defendant's argument, we start by acknowledging that we must look to the entire charge, rather than merely one part, to determine whether error occurred. (*People* v. *Hunter* (1956) 146 Cal.App.2d 64, 67 [303 P.2d 356].) Looking to the instructions as a whole,

---

[2]"Testimony which you believe given by one witness is sufficient for the proof of any fact. However, before finding any fact [required to be established by the prosecution] to be proved solely by the testimony of such a single witness, you should carefully review all the testimony upon which the proof of such fact depends."

we find no error. Not only was CALJIC No. 3.11 given, but the jury was further instructed as to the kind of evidence necessary to constitute corroboration, the method of determining whether the accomplice's testimony was corroborated, and that an accomplice's testimony should be viewed with distrust.[3]

Both the prosecution and the defense proceeded on the premise that corroboration was needed. The prosecutor never argued to the jury that it could accept Pelaiz' testimony without corroboration. Rather, he took care during his closing argument to point out Mrs. Mossa's and others' corroboration of Pelaiz' statements. As a result, the jury was not misled as to the need for corroboration and no prejudice resulted. The emphasis placed on the corroboration requirement, and on the other accomplice instructions, demonstrates that the jury was properly instructed on the proper standard of evaluating Pelaiz' testimony.

The Court of Appeal recently dealt with this issue in *People* v. *Stewart* (1983) 145 Cal.App.3d 967 [193 Cal.Rptr. 799]. It held that giving CALJIC No. 2.27 in conjunction with accomplice instructions was not error per se nor, in that case, prejudicial. Observing that both No. 2.27 and the accomplice instructions correctly state the law the court found that, on the whole, the jury was not misled. It nevertheless concluded that "a better practice would be to modify the language of [No. 2.27] as follows: 'Testimony which you believe given by one witness *whose testimony does not require corroboration* is sufficient for the proof of any fact . . . .'" (*Stewart, supra,* at p. 975, italics in original.) However, the *Stewart* court found that any confusion stemming from the use of No. 2.27 was beneficial to defendant because her accomplice was the only witness to testify on her behalf. We agree with the Court of Appeal's suggestion in *Stewart* that No. 2.27 should contain an explicit reference to testimony requiring corroboration, but, on

---

[3]The jury was given CALJIC Nos. 3.12 and 3.18 which read as follows: No. 3.12—"To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the offense which, if believed, by itself and without any aid, interpretation or direction from the testimony of the accomplice, tends to connect the defendant with the commission of the offense charged. [¶] However, it is not necessary that the evidence of corroboration be sufficient in itself to establish every element of the offense charged, or that it corroborate every fact to which the accomplice testifies. [¶] In determining whether an accomplice has been corroborated, you must first assume the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the offense. [¶] If there is not such independent evidence which tends to connect defendant with the commission of the offense, the testimony of the accomplice is not corroborated. [¶] If there is such independent evidence which you believe, then the testimony of the accomplice is corroborated."

No. 3.18—"The testimony of an accomplice ought to be viewed with distrust. This does not mean that you may arbitrarily disregard such testimony, but you should give to it the weight to which you find it to be entitled after examining it with care and caution and in the light of all the evidence in the case."

the basis of the facts described above, we conclude that the instructions here did not contain error nor were they prejudicial.

### III. SPECIAL CIRCUMSTANCE FINDING

The jury found that defendant killed Joseph Mossa while committing robbery, thereby constituting a felony-murder special circumstance. (§ 190.2, subd. (a)(17)(i).) In *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], we held that such a finding must be supported by proof that the defendant intended to kill, and that the jury must be instructed on the question of such intent. Defendant seeks reversal of the special circumstance finding on the ground that no such instructions were given in this case.

In *People* v. *Garcia* (1984) 36 Cal.3d 539 [205 Cal.Rptr. 265, 684 P.2d 826], we held *Carlos* retroactive to all cases not yet final. We also established four exceptions to the *Carlos* rule which would permit affirming a felony-murder special circumstance in spite of a failure to instruct regarding intent to kill.[4]

The People concede that two of the four exceptions are inapplicable. The court's failure to instruct on intent to kill did not arise " 'in connection with an offense for which the defendant was acquitted . . .' " nor was that failure unrelated to the offense for which he was convicted. (*Garcia, supra,* 36 Cal.3d at p. 554, quoting *Connecticut* v. *Johnson* (1983) 460 U.S. 73 [74 L.Ed.2d 823, 103 S.Ct. 969].) Second, defendant did not concede the question of intent to kill. (*Ibid.*)

The People assert that the remaining exceptions, known as the *Sedeno* and *Cantrell-Thornton* exceptions, do apply. Under the *Sedeno* exception, named for our decision in *People* v. *Sedeno* (1974) 10 Cal.3d 703 [112 Cal.Rptr. 1, 518 P.2d 913], the special circumstance finding may be sustained where the question of intent to kill " 'was necessarily resolved adversely to the defendant under other, properly given instructions.' " (*Garcia, supra,* 36 Cal.3d at p. 555, quoting *Sedeno, supra,* 10 Cal.3d at p. 721.)

 The People argue that the jury must have found intent to kill because they were instructed that the special circumstance could not be found true

---

[4]My own view is that neither the federal nor the state Constitution requires proof of intent to kill to impose the death penalty in felony-murder cases. (*People* v. *Whitt* (1984) 36 Cal.3d [724] at pp. 749-751 [205 Cal.Rptr. 810, 685 P.2d 1161] [dis. opn. of Lucas, J.].) A fortiori, the absence of jury instructions on intent to kill should not require reversal of the special circumstances finding. However, the majority view is otherwise and controls this case.

if the murder was "merely incidental" to the robbery rather than "committed in order to carry out or advance the commission of the crime of robbery." We rejected this contention in *People* v. *Whitt, supra,* 36 Cal.3d 724, 736. The People attempt to distinguish *Whitt* by noting that some evidence there indicated that the killing may have been a reflexive reaction to the victim's movements while no such evidence appears here. Such a distinction is unavailing because evidence here suggests that Mossa was shot as he attempted to escape. We conclude that this case is indistinguishable from *Whitt* for purposes of applying the *Sedeno* exception.

In addition, we observe that the prosecutor argued to the jury that defendant was guilty of felony murder and cautioned the jurors not to become "caught up" in the instructions pertinent to premeditated murder.[5] Clearly then, the jury's finding of first degree murder did not necessarily imply a finding of intent to kill.

■ Nor does the *Cantrell-Thornton* exception apply here. Under that exception, named for our decisions in *People* v. *Cantrell* (1973) 8 Cal.3d 672 [105 Cal.Rptr. 792, 504 P.2d 1256], and *People* v. *Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], a felony-murder special circumstance finding may be affirmed despite *Carlos* error where (1) the parties recognized that intent to kill was in issue, (2) they presented all evidence at their command on the issue, (3) the record shows intent to kill as a matter of law, and (4) the contrary evidence is not worthy of consideration. (*Garcia, supra,* 36 Cal.3d at p. 556.) The People contend that each of these criteria is met and that the special circumstance may be affirmed. We disagree.

Here, defendant presented a diminished capacity defense based on his intoxication and supported by expert testimony regarding his inability to form the requisite intent to kill. In the face of such substantial contrary

---

[5]Although the defendant was charged with premeditated murder, the theory of the People's case was based entirely upon the felony-murder doctrine. At a sidebar conference during the questioning of Dr. Hayes, the defendant's expert pathologist, the prosecutor sought to exclude testimony concerning defendant's intent to kill on the ground that such testimony was irrelevant to the felony-murder charge. The court overruled the objection when the prosecutor declined to stipulate that the sole theory of the case was felony murder.

Nonetheless, during closing arguments to the jury the prosecutor seemingly abandoned reliance on premeditated murder, choosing instead to focus exclusively on felony murder. The prosecutor stated, "But don't be confused by . . . the fact that you will be given instructions, for example, on malice aforethought, premeditation, deliberation and the state of mind that goes into those because our case, ladies and gentlemen, is simply this: This Defendant is guilty of first degree murder under the felony murder rule. [¶] I submit to you, ladies and gentlemen, that the People have proven beyond a reasonable doubt the elements of this crime based upon the felony murder rule. I mention that to you at this time so you don't become inappropriately caught up in the instructions that pertain to other forms of homicide and elements that are not applicable to that felony murder rule."

evidence, we cannot say that the record shows that defendant possessed such intent as a matter of law or that defendant's own evidence was not worthy of consideration. We conclude that the *Cantrell-Thornton* criteria were not satisfied here.

## IV. PENALTY PHASE ISSUES

In light of our conclusion that the special circumstances finding must be overturned, the penalty judgment must be vacated as well. Although defendant raises several issues in connection with the penalty phase trial, none involves a question that necessarily will recur on retrial of the penalty phase (if such a retrial occurs) and thus none warrants discussion here.

## V. CONCLUSION

The judgment of guilty as to both counts and the finding that the firearm allegation is true are affirmed. The special circumstance finding is vacated. The judgment imposing the death penalty is reversed and the cause remanded for a retrial of the special circumstance allegation and, if necessary, the penalty phase.

Mosk, J., Broussard, J., and Kaus, J., concurred.

Reynoso, J., concurred in the judgment.

**GRODIN, J.**—I concur in the judgment and in the reasoning of the majority opinion with one small qualification. While Dr. Morrison's extensive experience performing blood alcohol tests on dead bodies may well qualify him as an expert on many matters relating to alcohol, I cannot accept that either such experience, or his asserted awareness of "the extensive medical literature dealing with alcohol and behavior," qualified him as an expert on the question whether "a person who performed the acts ascribed to defendant would have the requisite intent to commit robbery *regardless of whether such person had been drinking or was drunk.*" (Majority opn., *ante,* p. 828 italics added.)

Whatever Morrison is an expert at, he is surely not an expert in the behavioral sciences or in judging the mental capabilities of individuals based on their overt behavior *apart* from the effects of alcohol. At the very least, defendant's objections to this testimony should have been sustained. I am skeptical also about the adequacy of the foundation to establish Dr. Morrison's expertise with respect to the balance of his rebuttal testimony as described in the majority opinion, but I agree that in both respects any error was harmless on this record.

**BIRD, C. J.,** Dissenting.—I share Justice Grodin's views concerning Dr. Morrison's testimony. For the reasons expressed in my dissenting opinions in *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680] and *People* v. *Turner* (1984) 37 Cal.3d 302 [208 Cal.Rptr. 196, 690 P.2d 669], I respectfully dissent.