[No. A046190. First Dist., Div. Three. Sept. 18, 1990.]

LARRY JACKSON, Plaintiff and Appellant, v.
DEFT, INC., et al., Defendants and Respondents.

**COUNSEL**

Kazan & McClain, Steven Kazan and Bryce C. Anderson for Plaintiff and Appellant.

Larson, Burnham & Trutner, Steven M. Marden, Kathleen A. Clark, O'Connor, Cohn, Dillon & Barr, Mark Oium, Lisa T. Ungerer, Eckert, Seamans, Cherin & Mellott and C. Arthur Wilson, Jr., for Defendants and Respondents.

**OPINION**

**STRANKMAN, J.**—Plaintiff Larry Jackson appeals from a summary judgment entered in favor of defendants Deft, Inc. (Deft) and Koppers Company, Inc. (Koppers), in his personal injury action. Plaintiff, formerly a civilian painter for the Navy, alleged that his respiratory system was damaged by exposure to defendants' paint products. The trial court granted summary judgment on the alternative grounds that defendants were protected from liability by the military contractor defense and that under state tort law principles, their warnings on their products were adequate as a matter of law. Because we conclude that triable issues of fact exist as to both the applicability of the defense and the adequacy of the warnings, we reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### a. *Introduction*

Plaintiff filed a first amended complaint against numerous defendants, including Deft and Koppers. He alleged that during his employment by the Department of the Navy, both at Mare Island Naval Shipyard (Mare Island) from 1975 to 1977 and at the Alameda Naval Air Station (Alameda) from 1977 to 1985, he was exposed to paint supplied by defendants which contained toluene diisocyanate, and which caused him to develop asthma and other disabilities. Plaintiff alleged negligent manufacture and distribution of defective products, breach of the implied warranty of fitness for use, deliberate distribution of a dangerous product without adequate warning of its hazards, fraudulent concealment of product dangers, and other legal theories.

Deft and Koppers moved for summary judgment, urging that the military contractor defense as explained in *Boyle* v. *United Technologies Corp.* (1988) 487 U.S. 500 [101 L.Ed.2d 442, 108 S.Ct. 2510] shielded them from any liability under state tort law, and that even if the defense did not apply, the warnings on their paint products were adequate as a matter of law.

### b. *Deft's Summary Judgment Motion*

Deft asserted that the following facts pertinent to the military contractor defense were undisputed: it produced its weather resistant aliphatic polyurethane coating according to military specifications from the Navy; it provided the military with any information it had regarding hazards associated with the use of its product; Navy specifications included specific provisions for marking and labeling, including caution labeling; and Deft complied with all Navy specifications, including cautionary language. On the adequacy of its warnings under principles of state tort law, Deft asserted that the warnings on its paint can labels were "clear, understandable, and completely unambiguous."

Deft's evidence in support of its motion included the military specifications under which it produced its weather resistant aliphatic polyurethane coating, copies of certain of its labels, and the declaration of Irwin Levine, its vice-president in charge of industrial sales. Levine declared that between 1972 and the present, Deft's products were sold either directly to Alameda or to the General Services Administration for use by military

bases and military contractors.[1] Between 1972 and 1978, Deft complied with all labeling requirements of military specification MIL-C-81773B (AS), including cautions on product use.

That specification required a label on every component container in every kit and on each exterior shipping container with the following language: "CAUTION: THIS COATING MATERIAL IS TOXIC AND FLAMMABLE AND SHALL NOT BE USED IN CONFINED AREAS WHERE THERE ARE OPEN FLAMES, ARCING EQUIPMENT, HOT SURFACES AND WHERE SMOKING IS PERMITTED. [¶] USE ONLY WITH ADEQUATE VENTILATION. [¶] AVOID BREATHING OF VAPOR. [¶] DO NOT GET IN EYES, ON SKIN, ON CLOTHING. [¶] IN CASE OF CONTACT, IMMEDIATELY FLUSH EYES OR SKIN WITH PLENTY OF WATER: FOR EYES, GET MEDICAL ATTENTION."

The specification also required a label on each component unit with "mixing, thinning and spraying instructions and precautions." Among the precautions were the following: "10. Keep container closed when not in use. [¶] 11. Isolate the painting procedure from the exposure of nearby personnel. Only painters should be allowed in the spray-painting and adjacent areas. [¶] 12. Spray painters shall be fully clothed with collars buttoned and sleeves taped at the wrists."

Levine also declared that between 1978 and 1980, although the specification was amended to require precautions on a separate sheet, rather than the product label, Deft was authorized by the Navy to continue using the previous labels. In 1980, the specification was superseded by Air Force specification MIL-C-83286B. That specification required less information on each label on each individual can and container. The specification called for the following: "CAUTION: Keep away from flames. Protective clothing and adequate ventilation must be used during mixing procedure, transfer or application of the coating. Consult the departmental medical service for safe handling instructions." From 1980 through the present, Deft used that language on its labels.

### c. *Koppers's Summary Judgment Motion*

In support of its assertion of the military contractor defense, Koppers claimed that the following was undisputed: the Navy approved reasonably precise specifications for the labeling of weather resistant aliphatic polyurethane coatings; Koppers sold such a coating to Alameda between 1977 and 1983 only pursuant to MIL-C-81773B or MIL-C-81773C; it

---

[1] It appears to be undisputed that neither Deft nor Koppers sold polyurethane coatings to Mare Island while plaintiff worked there.

labeled the coating pursuant to those specifications; the Navy was aware of the hazards posed by coatings containing isocyanates; and the Navy made no complaints concerning Koppers's compliance with the labeling requirements of the specifications. Koppers also asserted that the labels it used adequately warned the user of the health hazards posed by the product and on the proper procedures to be followed for its use.

Koppers's motion was supported by several declarations, including that of Ray DiMaio, then a Koppers vice-president, the pertinent military specifications, and copies of Koppers's labels. One of those labels stated in capital letters: "WARNING! FLAMMABLE [¶] VAPOR HARMFUL. MAY CAUSE IRRITATION."

The label also included the following warning: "IMPORTANT: Use with adequate ventilation during application and drying. In tanks and other confined areas, use only with adequate forced air ventilation to prevent dangerous concentrations of vapors which could cause death by explosion or inhalation. Use fresh air masks, clean protective clothing and explosion-proof equipment. Prevent flames, sparks, welding and smoking. Follow OSHA regulations regarding ventilation and respiratory equipment."

### d. *Plaintiff's Opposition to the Motion*

Opposing the motion, plaintiff urged that defendants had not established all the elements of the military contractor's defense, and that the product manufactured by defendants was defective and did not contain an adequate warning.

Evidence submitted in opposition to the motion included excerpts from depositions of Levine and DiMaio. Levine testified that Deft sold polyurethanes to industrial accounts as well as to the military. The industrial accounts constituted only about 20 percent of its business. There was no difference between the isocyanate component of the polyurethane paint sold to industrial accounts and to the military; the products were essentially the same.

Levine did not know if anyone at Deft investigated whether the labels of the paint sold to the Navy provided adequate warning of the hazards of isocyanates, but speculated that some of its technical directors "might have looked into something of that sort." Levine also testified that the staff determined what language to put on the labels, based on what the Navy asked for, "some other stuff that's normal that we get from our association," and "any information we got from Mobay [a supplier]."

DiMaio testified in his deposition that Koppers sold polyurethane paints to commercial accounts. Those paints were the same as the product sold to the military. DiMaio considered the military specifications for labeling to be minimum standards; in his view, the company was not limited by those specifications, and could add additional information which it considered appropriate.

Plaintiff also submitted a declaration by Daniel A. Johnson, Ph.D., a psychologist specializing in "the area of human factors." He declared that in his professional career he had been concerned with the adequacy of warning labels on potentially toxic materials used in the workplace and the way those labels are perceived by the average worker. He declared that he was "familiar with" the hazards associated with use of aliphatic polyurethane coatings in the workplace. He explained that he had been asked to review labels which he was informed were placed on containers of paint used at Alameda and Mare Island. After considering their readability and legibility, and the format of the information provided, he concluded that both Deft labels were inadequate safety warning labels which fail to give the user the specific information he needs to avoid the product hazard; he also analyzed and criticized the Koppers labels.

Deft objected to consideration of Johnson's declaration, in part for lack of an adequate showing of his qualifications as an expert witness. The trial court sustained the objection.

### e. The Trial Court's Ruling

The court granted summary judgment on the alternative grounds that defendants were shielded from liability by the military contractor defense and that their warnings on their products were adequate as a matter of law. Judgment was entered April 20, 1989.

### f. The Stipulated Judgments

Later, stipulated judgments were entered in favor of defendants DeSoto, Inc., the Dexter Corporation, and the Sherwin-Williams Company, providing that a reversal by this court as to either Deft or Koppers would be deemed to have reversed those stipulated summary judgments as well. A stipulated order granting summary judgment in favor of defendant Mobay Corporation was also entered; that order provided that a reversal or affirmance as to both Deft and Koppers would be deemed to have the same result as to Mobay; however, an affirmance as to one defendant and a reversal as to the other would entitle defendant Mobay to urge this court to affirm summary judgment in its favor. Plaintiff filed a timely notice of

appeal from the judgment in favor of Deft and Koppers and from the stipulated judgments entered in favor of the other defendants, including Mobay. Defendants Deft, Koppers and Mobay have filed respondents' briefs.

## THE MILITARY CONTRACTOR DEFENSE

First, we consider whether defendants established all the elements of the military contractor's defense.

Summary judgment is appropriate only if the evidence shows there is no triable issue of any material fact, and that the moving party is entitled to judgment as a matter of law. The trial court's obligation in ruling on a summary judgment motion is to determine whether issues of fact exist, not to decide the merits of the issues themselves. When making that determination, the trial court must strictly construe the affidavits of the moving party, and liberally construe those of the opponent. (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) Any doubts about granting the motion should be resolved in favor of the opponent of the motion. (*Slobojan* v. *Western Travelers Life Ins. Co.* (1969) 70 Cal.2d 432, 437 [74 Cal.Rptr. 895, 450 P.2d 271].)

Whether the facts establish the conditions for the military contractor defense is generally a question of fact for the jury. (*Boyle* v. *United Technologies Corp.*, *supra*, 487 U.S. at p. 514 [101 L.Ed.2d at p. 459].) In *Boyle*, the United States Supreme Court clarified at least to some extent the circumstances when a contractor providing military equipment to the federal government can be held liable under state tort law for injury caused by a design defect. After a Marine helicopter copilot drowned because he could not escape when his helicopter crashed into the sea, his father sued the helicopter manufacturer, alleging defective design of the escape hatch. The manufacturer urged that because it had built the aircraft according to military specifications, it was protected from liability by the military contractor defense. (*Id.*, at pp. 502-503 [101 L.Ed.2d at pp. 451-452].)

Initially, the *Boyle* court explained the common law basis of the defense. The court instructed that a few areas involving "'uniquely federal interests'" are so committed to federal control under the Constitution and federal law that state law is preempted by federal common law. It then concluded that the procurement of equipment by the United States from independent contractors is of uniquely federal interest so that under some circumstances, state law attempting to impose tort liability on such contractors may be displaced. (*Boyle* v. *United Technologies Corp.*, *supra*, 487 U.S. at pp. 504-506 [101 L.Ed.2d at pp. 452-454].)

But the court then cautioned, "That the procurement of equipment by the United States is an area of uniquely federal interest does not, however, end the inquiry. That merely establishes a necessary, not a sufficient, condition for the displacement of state law. Displacement will occur only where . . . a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,' [citation], or the application of state law would 'frustrate specific objectives' of federal legislation [citation]." (*Boyle* v. *United Technologies Corp., supra,* 487 U.S. at p. 507 [101 L.Ed.2d at pp. 454-455], fn. omitted.)

To illustrate the limits of the defense, the court offered the following example: "If . . . the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer . . . a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context." (*Boyle* v. *United Technologies Corp., supra,* 487 U.S. at p. 509 [101 L.Ed.2d at p. 456].)

On the other hand, the court explained, when the state-imposed duty of care that is the basis of the contractor's liability under state tort law is precisely contrary to the duty imposed by the government contract, there may be a " 'significant conflict' " between the state law and the federal interest. (*Boyle* v. *United Technologies Corp., supra,* 487 U.S. at p. 509 [101 L.Ed.2d at p. 456].) To identify those situations in which a significant conflict with federal policy or interests does arise, the court looked to the Federal Tort Claims Act, which authorizes certain tort actions against government employees, except any claim based on a "discretionary function." The court reasoned that the selection of the appropriate design for military equipment is a discretionary function within the meaning of the exemption, as it involves the balancing of technical, military, and social considerations. Permitting tort suits against contractors for design defects would produce the same effect sought to be avoided by the Tort Claims Act exemption. (*Id.,* at p. 511 [101 L.Ed.2d at p. 457].) "It makes little sense to insulate the Government against financial liability for the [discretionary] judgment that a particular feature of military equipment is necessary when the Government produces the equipment itself, but not when it contracts for the production. In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced." (*Id.,* at p. 512 [101 L.Ed.2d at pp. 457-458], fn. omitted.)

█ Spelling out the scope of the displacement, the court held that liability for design defects in military equipment cannot be imposed under state law, when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." (*Boyle* v. *United Technologies Corp.*, *supra*, 487 U.S. at p. 512 [101 L.Ed.2d at p. 458].) The first two conditions assure that the design feature was considered by a government officer and not merely by the contractor itself; the third condition avoids creating an incentive for the manufacturer to withhold knowledge of risks. (*Ibid.*)

Although the *Boyle* court did not address the applicability of the defense in a failure-to-warn case, other courts in several post-*Boyle* cases have considered that issue. For example, in *Garner* v. *Santoro* (5th Cir. 1989) 865 F.2d 629, a civilian painter who had worked spray-painting destroyers being built for the Navy brought a strict liability personal action against the paint manufacturer. The trial was held before *Boyle* was decided, and the jury awarded substantial damages to plaintiff. The appellate court reversed, because the trial court had erroneously concluded that the government contractor defense was inapplicable as a matter of law. After analyzing *Boyle*, the appellate court held that the defense can be applied in a failure-to-warn case. But the court also remarked on "the difficulty that a defendant will have under *Boyle* in establishing an identifiable federal interest or policy in the existence or methods of warning and a significant conflict between that federal interest or policy and the operation of state law." (*Id.*, at pp. 635-636.)

Recently, in *In re Joint E. & S. Dist. New York Asbestos Lit.* (2d Cir. 1990) 897 F.2d 626, the court considered whether *Boyle* barred a state law failure-to-warn action seeking recovery for injuries alleged to have resulted from exposure to asbestos-based cement used at the Brooklyn Navy Yard. The majority held that to establish displacement under the military contract defense of any state law duty to warn, the defendant must show that the applicable federal contract includes warning requirements that significantly conflict with those which might be imposed by state law. In addition, the defendant must show that whatever warnings accompanied a product resulted from a determination of a government official, so that the government itself dictated the content of the warnings meant to accompany the product. (*Id.*, at p. 630.)

The majority stated, "Stripped to its essentials, the military contractor's defense under *Boyle* is to claim, 'The Government made me do it.' *Boyle* displaces state law only when the Government, making a discretionary,

safety-related military procurement decision contrary to the requirements of state law, incorporates this decision into a military contractor's contractual obligations, thereby limiting the contractor's ability to accommodate safety in a different fashion." (*In re Joint E. & S. Dist. New York Asbestos Lit., supra*, 897 F.2d at p. 632.) The majority concluded that if there was an issue of material fact as to the government's control over the warnings accompanying a product, the matter could not be resolved on summary judgment. (*Id.*, at pp. 633-634.)[2]

*Dorse* v. *Armstrong World Industries, Inc.* (S.D. Fla. 1989) 716 F.Supp. 589 also involved the application of the government contractor defense in a wrongful death action against the manufacturer of asbestos-containing products who sold materials to the Navy under government contracts. After considering *Boyle*, the trial court concluded that, although the government contractor defense could apply to failure-to-warn cases, it was inapplicable in plaintiff's case. The case did concern an area of uniquely federal interest, the procurement of asbestos during World War II for naval ships. However, the evidence showed that there was no conflict between the state duty to warn and the federal contractual duty. The Navy Department's specifications did not contain any prohibitions or health warnings on the product, and deposition testimony indicated that the defendant could have complied with both its state tort law duty and its Navy contract. (*Id.*, at pp. 590-591; affd. *per curiam* (11th Cir. 1990) 898 F.2d 1487.)

A similar result was reached in *In re New York City Asbestos Litigation* (1989) 144 Misc.2d 42 [542 N.Y.S.2d 118]. Plaintiffs were widows of Navy yard workers who died allegedly as a result of exposure to asbestos-containing products. One defendant manufacturer moved for summary judgment on the ground that its compliance with military contract specifications was a complete defense to any negligence or strict liability claims. The court denied the motion, for several reasons, among them that the military specifications for the products required asbestos but said practically nothing

---

[2] One justice separately concurred. He acknowledged *Boyle*'s holding that the operation of state law is displaced whenever it conflicts significantly with an identifiable federal policy or interest. However, he disagreed with the majority's interpretation of that holding. The concurring justice reasoned that there is a strong federal interest in the supply of military products and equipment to the armed forces through contractors who will not refuse to bid for fear of lawsuits or will not pass higher liability insurance premiums on to the government. That interest, he explained, clashes significantly with the operation of state law governing liability for dangerous products. Given that conflict, the concurring justice believed that whether the government prevented the asbestos manufacturers from including a warning on its products was irrelevant. The only issues were whether the government approved reasonably precise specifications, the equipment conformed to those specifications, and the supplier warned the government of hazards known to the supplier but not to the United States. (*In re Joint E. & S. Dist. New York Asbestos Lit., supra*, 897 F.2d at pp. 637-638 (conc. opn. of Miner, J.).)

about health warnings; therefore, the manufacturer could have complied with both the specifications and placed adequate warnings on the packages without frustrating any identifiable federal interest. (*Id.*, at p. 121.)

Guided by the foregoing authority, we examine the evidence in the present case. Defendants' evidence did not establish as a matter of law the necessary significant conflict between federal contracting requirements and state law. Although defendants' evidence did show that certain warnings were required by the military specifications, that evidence did not establish that the specifications placed any limitation on additional information from the manufacturers to users of their products. Instead, the evidence suggested no such limitation existed. For instance, Koppers's DiMaio testified that the government's specifications concerning labeling were minimum standards, and that if the company considered it appropriate, it could add to that information without violating the specifications.[3] While the testimony of Deft's Levine was not equally explicit, he did not testify that the military labeling specifications precluded other information on the labels. He had no recollection of any discussion with the Navy concerning whether the company could add information to the labels on products sold to the Navy. Levine also testified that the company put what the Navy asked for on their labels, as well as "some other stuff that's normal that we get from our association" and information from its supplier. At least one reasonable inference from that testimony is that the company's labeling was not absolutely controlled by the military specifications.

On this record, then, there is at least a triable issue of fact concerning the existence of a substantial conflict between a federal interest and state law, and the trial court erred in granting summary judgment for defendants. *Nicholson* v. *United Technologies Corp.* (D.Conn. 1988) 697 F.Supp. 598, upon which defendants rely, is not to the contrary. In that case a civilian employee of an Army aviation facility was injured when the landing gear of a military helicopter which he was repairing exploded. He sued the gear manufacturer, alleging negligence, strict liability, and failure to warn. The manufacturer moved for summary judgment, arguing in part that the government contractor defense barred recovery for any failure to warn.

The trial court granted the motion. It emphasized that plaintiff had asserted a failure to provide adequate warnings on repair and disassembly of

---

[3] DiMaio's deposition testimony included the following exchange: "Q. If the government told you something had to be on label, would you comply? [¶] A. We would comply. [¶] Q. All right. But you did not consider yourself limited by whatever was in the mil spec in terms of the language on the label? [¶] A. That's right. [¶] Q. You were free to add additional material if you felt it was appropriate? [¶] A. That's true. [¶] Q. And as you understood it, you could add those additional materials without being out of compliance with the military specifications? [¶] A. That's true."

the gear in the maintenance manual, rather than any "independent duty to warn." The court reasoned, "When the government provides or approves specifications of a product which calls for some safeguards but not others, the government contractor is not under a duty to provide every known safety device where it is not called for by the government contract . . . . The choice is that of the government. The contractor is obliged to the government's decision. The same is undoubtedly true if the government provides 'reasonably precise' specifications for the contents of a maintenance manual. A contractor should not be held liable for deficiencies in the contents of a maintenance manual if the contents are *dictated* by the government." (697 F. Supp. at pp. 603-604, italics added.) The court then found sufficient, specific governmental control over the contents of the manual to satisfy the " 'reasonably precise' " specifications element of *Boyle*. (*Id.*, at p. 604.)

Defendants in the present case argue that here, too, the military imposed reasonably precise specifications for the warnings. However, we agree with the court in *In re Joint E. & S. Dist. New York Asbestos Lit.*, *supra*, 897 F.2d 626, which characterized *Nicholson* as a case in which the scope of governmental control over the content of the repair manual supported the conclusion that the specifications left no room for any addition by the manufacturer. (*Id.*, at p. 633.) In contrast, as we have already explained, defendants' own depositions in the present case at least raise a triable issue of fact as to whether the specifications dictated the content of the labels and did not permit inclusion of any additional information by defendants.

Given our conclusion on this triable issue of fact, we need not consider plaintiff's assertions that Deft failed to establish its status as a military contractor, and that both defendants failed to establish that the paint products were " 'military equipment' " within the scope of the defense, or that they warned the government of all hazards known to them and not known to the government.

■ Nevertheless, we note that " 'military equipment' " within the protection of the defense is an imprecise term. An ordinary consumer product purchased by the armed forces, such as a can of beans, does not qualify, whereas an essential component of a military aircraft, such as its escape system, does. (*McKay* v. *Rockwell Intern. Corp.* (9th Cir. 1983) 704 F.2d 444, 451.) Some courts have focused on the purpose or use of the product; for example, in *Garner* v. *Santoro, supra*, 865 F.2d at page 638, the court flatly stated, "[P]aint which is used on Navy Iran destroyers specifically because of its anti-corrosive qualities fits within the parameters of military equipment." Other courts consider whether the product is sold to both military and nonmilitary buyers. In *Dorse* v. *Armstrong World Industries,*

*Inc.* (Fla. 1987) 513 So.2d 1265, the court commented that goods are commercial and not military when they are the same or substantially similar to goods produced for sale to nonmilitary buyers. "If the military is only one outlet in a *larger market,* the policies of strict liability will continue to require that the enterprise itself must bear the cost of the injuries it produces. It would be absurd to permit one injured party to recover damages because he was injured by a product sold in the marketplace while another is denied recompense solely because he was injured by the same or a substantially similar product produced for a military purchaser." (*Id.,* at p. 1269, italics added.)

Plaintiff seems to argue that military equipment means a product made exclusively for military use with no commercial purpose; however, plaintiff cites no case espousing that extreme position. In our view, if a product is produced according to military specifications and used by the military because of particular qualities which serve a military purpose, and is incidentally sold commercially as well, that product may nonetheless still qualify as military equipment under the military contractor defense. Thus in this case, the evidence that the polyurethane produced by Deft and Koppers was also sold commercially does not absolutely foreclose application of the military contractor defense. Conversely, the scant evidence in this record concerning the qualities of these paints which made them suitable for military aircraft is insufficient to establish as a matter of law that they are military equipment.

### ADEQUACY OF THE WARNINGS UNDER STATE LAW

Plaintiff also contends that the trial court erred in holding that the warnings on their paint cans were adequate as a matter of law. ■■■ In a related argument, plaintiff contends the trial court erred in sustaining defendants' objection to the declaration of its expert witness, Dr. Johnson.

We are aware that in some products liability cases, courts have permitted expert testimony as to the adequacy of a warning provided to the user of a product. (See Annot., Products Liability: Admissibility of Expert or Opinion Evidence as to Adequacy of Warning Provided to User of Product (1983) 26 A.L.R.4th 377 and cases cited.) ■■ Nevertheless, witnesses may testify as experts only if they have "special knowledge, skill, experience, training, or education" sufficient to qualify them as experts on the subject to which their testimony relates. (Evid. Code, § 720, subd. (a).) An expert's qualifications must be related to the particular subject on which he or she is giving expert testimony. A reviewing court will uphold the trial court's ruling on the question of an expert's qualifications absent an abuse

of discretion. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372].)

■ Dr. Johnson's declaration stated that he was a psychologist specializing "in the area of human factors," but that term was not defined. He also declared that he had been "concerned with" the adequacy of warning labels, and that he was "familiar with" the hazards associated with the use of aliphatic polyurethane coatings in the workplace, but he did not specify any details about his experience which would have enabled the trial court to assess his qualifications to testify on the subject of the adequacy of the warnings at issue here. The court did not abuse its discretion in refusing to consider the declaration.

■ As we will explain, however, we have concluded that the court did err in concluding that the warnings on defendants' products were adequate as a matter of law. Under California law, a product may be defective because of the absence of an adequate warning of the dangers inherent in its use. (*Brown* v. *Superior Court* (1988) 44 Cal.3d 1049, 1057, 1065 [245 Cal.Rptr. 412, 751 P.2d 470].) Whether the absence of a warning makes a product defective depends on several factors, among them the normal expectations of the consumer as to how a product will perform, degrees of simplicity or complication in its operation or use, the nature and magnitude of the danger to which the user is exposed, the likelihood of injury, and the feasibility and beneficial effect of including a warning. (*Cavers* v. *Cushman Motor Sales, Inc.* (1979) 95 Cal.App.3d 338, 347-348 [157 Cal.Rptr. 142].) Occasionally the evidence is such that the adequacy of a warning may be decided by the court as a matter of law. (See, e.g., *Temple* v. *Velcro USA, Inc.* (1983) 148 Cal.App.3d 1090, 1094-1095 [196 Cal.Rptr. 531] [warning never to use a Velcro fastener for a hot air balloon fastener].) In most cases, however, the adequacy of a warning is a question of fact for the jury. (*Crane* v. *Sears Roebuck & Co.* (1963) 218 Cal.App.2d 855, 859 [32 Cal.Rptr. 754]; see *Gonzales* v. *Carmenita Ford Truck Sales, Inc.* (1987) 192 Cal.App.3d 1143, 1147-1152 [238 Cal.Rptr. 18]; *Lunghi* v. *Clark Equipment Co.* (1984) 153 Cal.App.3d 485, 491-494 [200 Cal.Rptr. 387].)

Here Deft's labels were not identical to those of Koppers. Deft's labels changed in 1980 and provided less information than in previous years. Reasonable people might disagree about whether any or all of the warnings on these labels were unambiguous and conspicuous, and whether they provided sufficient information on the extent of risks and symptoms of overexposure to defendants' products. Defendants were not entitled to summary judgment on the ground that their labels were adequate as a matter of law.

## DISPOSITION

The judgment is reversed. Costs to appellant.

White, P. J., and Merrill, J., concurred.

A petition for a rehearing was denied October 10, 1990, and respondents' petition for review by the Supreme Court was denied December 12, 1990.