Filed 12/21/16 Unmodified opinion attached

# CERTIFIED FOR PARTIAL PUBLICATION[*]

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| GARY KASE et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>METALCLAD INSULATION<br>CORPORATION,<br><br>    Defendant and Respondent. | A143590<br><br> (San Francisco City & County<br> Super. Ct. No. CGC-11-275958)<br><br>ORDER MODIFYING OPINION AND<br>CERTIFYING OPINION FOR<br>PARTIAL PUBLICATION<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion in the above-entitled matter filed on November 22, 2016, was certified for partial publication in the Official Reports.  After the court's review of requests under California Rules of Court, rule 8.1120, and good cause established under rule 8.1105, it is hereby ordered that part II.C. of opinion should be published in the Official Reports.

Dated:

_____
Margulies, P. J.

_____

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.D.

Trial Court:  San Francisco City and County Superior Court

Trial Judge: Hon. Teri L. Jackson

Counsel:

Brayton Purcell, LLP, Gary L. Brayton and Richard M. Grant for Plaintiff and Appellant.

Dentons US LLP, Lisa Lurline Oberg, Felicia Y. Feng and Andrea J. Casalett; Morgan, Lewis & Bockius LLP, Thomas M. Peterson and Deborah E. Quick for Defendant and Respondent.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| GARY KASE et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>METALCLAD INSULATION CORPORATION,<br><br>        Defendant and Respondent. | A143590<br><br>(San Francisco City & County Super. Ct. No. CGC-11-275958) |

Plaintiffs appeal from a defense summary judgment in this asbestos case arising from Gary Kase's exposure to asbestos insulation used on nuclear submarines during the early 1970's. The principal issue we must decide is whether the Navy's procurement of asbestos insulation for its nuclear submarines comes within the ambit of the government contractor defense set forth in *Boyle v. United Technologies Corp.* (1988) 487 U.S. 500 (*Boyle*). This defense has long been available, even if not always successfully proved up, in asbestos lawsuits brought against the manufacturers and suppliers of military hardware and equipment. However, defendant Metalclad Insulation Corporation (Metalclad) did not design or produce a piece of hardware or equipment that included asbestos-containing materials. Rather, as a broker, it arranged for asbestos-containing insulation to be shipped directly to the Mare Island Naval Shipyard, where workers packed it around the submarine piping it protected.

Metalclad provided the asbestos-containing insulation, called Unibestos, pursuant to and in compliance with relatively detailed performance and testing specifications.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II. C. and II. D.

1

These specifications did not expressly call out for asbestos in the insulation. But according to the undisputed record evidence, the specifications could only be met by asbestos-containing insulation, and the only product on the Navy's approved list of suitable products was Unibestos. It is also undisputed that for decades the Navy studied the health hazards associated with the use of asbestos products and, despite the concerns raised by these studies, continued to require use of these products and continued to expressly approve the use of Unibestos. The Navy did not, however, participate in the development or manufacture of Unibestos and, in addition to military sales, the insulation has long been sold commercially.

In *Boyle*, the Supreme Court set forth the requirements of the government contractor defense. It held, among other things, that the government, itself, need not design the allegedly defective product for the defense to apply. The government may select a design, and so long as the government thoroughly reviews and makes a considered judgment call about the design, the defense can apply. (*Boyle*, *supra*, 487 U.S. at pp. 512–513.) By way of contrast, the court explained the defense will not apply if the government procures, for example, a "stock" helicopter designated solely by the manufacturer's model number and which "happen[s]" to have the complained of defect. (*Id.* at p. 509.) In such a case, said the court, the manufacturer could meet both its contractual obligation to the government and its alleged design duty under state law. There would, thus, be no " 'significant conflict' " between federal interests and state law, rendering the defense unavailable. (*Ibid.*)

The Supreme Court's limiting exemplars led the Ninth Circuit Court of Appeals to pronounce the defense inapplicable to goods "readily available, in substantially similar form, to commercial users" and, in turn, to conclude the defense was not available to the insulation manufacturers in that case. (*In re Hawaii Federal Asbestos Cases* (9th Cir. 1992) 960 F.2d 806, 811 (*Hawaii*).) Since then, however, a number of courts including this Court (*Oxford v. Foster Wheeler* (2009) 177 Cal.App.4th 700, 710 (*Oxford*)), have taken a more expansive view and concluded the fact a product has some commercial market does not preclude the defense. One federal court has stated there is no "off-the-

2

shelf" limitation to its application (*Miller v. Diamond Shamrock Co.* (5th Cir. 2001) 275 F.3d 414, 419 (*Miller*)), and another has granted summary judgment on claims against Metalclad like those made by plaintiffs here (*Brown v. Asbestos Defendants* (E.D. Pa. Oct. 19, 2012, No. 2:10-60090-ER) 2012 WL 7761205 (*Brown*)). We remain of the view that the Supreme Court, in *Boyle*, did not limit the defense to necessarily exclude the procurement of products also sold commercially. Rather, the point the high court was making in positing a purchase of a "stock" helicopter identified by manufacturer's model number was that, where a purchase does not involve "reasonably precise specifications" bearing on the challenged design feature, the government necessarily has not made a considered evaluation of and affirmative judgment call about the design. That cannot be said, however, about the Navy's procurement of the asbestos insulation at issue here— made after years of evaluating and weighing the utility of and the health hazards associated with asbestos products and pursuant to specifications that, according to the record evidence, required an asbestos product. We therefore affirm the summary judgment as to the plaintiffs' defective design claims.

We also affirm the summary judgment on plaintiffs' failure to warn claims on the ground the evidence was insufficient to raise a triable issue as to causation.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Unibestos is asbestos-containing insulation that has been available for decades.

In January, 1936, the United States Navy commissioned a 30-day study to determine Unibestos's suitability for military use. The study determined Unibestos had satisfactory heat insulating properties and was light weight (which was desirable), but questions remained as to whether it had sufficient stability to meet naval needs. Accordingly, the Navy conducted a six-month, follow-on study regarding stability. It also conducted a further study establishing Unibestos's performance at high temperatures. Thereafter, the Navy used Unibestos on its vessels, and the product was subsequently ordered in accordance with Navy specifications, which specifically called for asbestos in insulation.

Early on, Unibestos was manufactured in the United States by Union Asbestos and Rubber Company (Union).  One early advertisement touted Unibestos as "durable," "efficient," and "practical," and so "increasingly popular with shipbuilders" it was "being used almost exclusively in some of the finest marine construction work" of the day.  A 1943 advertisement emphasized ease of installation, an "interestingly low" price, and availability in numerous lengths and thicknesses.

Pittsburgh Corning acquired Unibestos from Union in 1962.  One undated Pittsburgh Corning advertisement proclaimed Unibestos was "available everywhere."  An undated Pittsburgh Corning flyer stated Unibestos was ideal for "high-temperature insulation in the marine, refining, chemical, power, and petrochemical fields."

Pittsburgh Corning made no changes to the product between 1962 and 1972.  There is no evidence in the record as to the percent of Unibestos sold commercially.

During that timeframe, in August 1968, Metalclad brokered a delivery of Unibestos from Pittsburgh Corning to the Navy.  The purchase order called for "insulation material, pipe, thermal, tubular, molded in accordance with military specifications MIL-I-24244(SHIPS) DTD 66 AUG 22, type I, and amendment 1 DTD 68 FEB 15, and MIL-I-2781."

Specification MIL-I-2781 defined grades of insulation, each grade capable of shielding different temperatures.  It specified the size and shape of compliant insulation and defined various physical requirements to be confirmed by testing: maximum density, thermal conductivity, weight loss after tumbling, modulus of rupture, and changes after soaking heat.  Compliant insulation had to be "composed of heat-resisting compounds suitable for the temperature conditions and the purpose intended."

The Navy first issued specification MIL-I-2781 in 1955, and at that point, stopped expressly calling out for asbestos in insulation used to protect its equipment.  However, during the 1955–1973 timeframe, the Navy viewed asbestos as an expected material in insulation products provided pursuant to the specification, and asbestos-containing products were sometimes the only products preapproved for certain grades of insulation.  In fact, the list of prequalified products for certain grades of insulation attached to the

version of MIL-I-2781 in effect in 1968 listed Unibestos as the only prequalified product in grade II (insulation up to 750 degrees), class c (fibrous), and in grade III (insulation up to 1,200 degrees), class f (fibrous). The August 1968 purchase order issued to Metalclad sought insulation of both "subtype 1B, fibrous-temperatures up to 750 ºF" and "subtype 1F, fibrous-temperature up to 1200ºF." The evidence is uncontradicted that subtypes 1B and 1F are the equivalents of grade II, class c and grade III, class f. Thus, Unibestos was the only prequalified product meeting the purchase order specifications.

In 1971, the Navy amended specification MIL-I-2781 to prohibit high-asbestos materials, such as Unibestos, and in 1973, amended the specification again to prohibit asbestos in any insulation.

The other specification set forth in the Metalclad purchase order, MIL-I-24244, addressed "mineral-based thermal insulation" (including piping insulation compliant with MIL-I-2781) with "special corrosion and chloride requirements." To pass muster under MIL-I-24244, insulation had to pass an additional battery of quality conformance tests.[1]

Metalclad's expert in Navy ship design and construction, Dan Heflin, Jr., declared that based on his "personal knowledge of military specifications and review of documents . . . that in order to meet the needs expressed in MIL-l-24244, a product that contained asbestos was *required*." (Italics added.) There is no evidence in the record to the contrary.

---

[1] Specification MIL-I-24244 was issued as part of the Navy's SUBSAFE program, which the Navy established in the wake of a nuclear submarine accident in 1963, during which the USS Thresher sank with all crew members aboard. The Navy's investigation concluded that "deficient specifications, deficient shipbuilding practices, deficient maintenance procedures, and deficient operational procedures" led to the loss of the craft. Metalclad's expert stated the SUBSAFE program, "provide[d] additional emphasis and mandatory procedures to assure the adequacy of every item that in any way affects the submarine pressure hull watertight boundary and/or the ability of the submerged ship to recover from flooding." Propulsion was a particular focus of the SUBSAFE program, leading to strict controls over every aspect of the propulsion system inside the reactor compartment, including piping.

Metalclad's expert further stated the Navy "had unique specifications for thermal insulation used aboard nuclear powered submarines. These specifications were communicated to outside vendors, including Pittsburgh Coming [*sic*], by the Navy in Requests for Proposals for certain equipment and materials."[2]

The Navy's contract with Metalclad additionally called for various inspections and tests of the insulation, including inspections and tests at the Pittsburgh Corning manufacturing plant in Tyler, Texas by the Defense Contract Administration Services (DCAS). DCAS, according to Metalclad's expert, was the military's " 'eyes and the ears.' " Each lot of the supplied Unibestos had to measure up to the relevant specifications. The record contains evidence of communications from Pittsburgh Corning providing test results to assure the military the Unibestos—called out by brand name—met specifications.

While Metalclad's person-most-knowledgeable called the Naval inspections "exceptional," he could not "say there were any changes in the formulation" of the insulation compared to Unibestos sold commercially. Nor did the military contribute to the design of Unibestos. Rather, the role of the military in the manufacturing process was "[n]othing beyond the testing."

The Unibestos that Metalclad brokered in 1968 never went to or through a Metalclad facility. Rather, it was sent from the Pittsburgh Corning facility by rail to the Mare Island Naval Shipyard in November of that year. It was received at the shipyard in early December, "test[ed]" again for compliance with the applicable specifications, and "released for use" in March 1969 to insulate reactor components aboard four nuclear submarines, the USS Drum, USS Pintado, USS Guitarro, and USS Hawkbill. Metalclad received $235 on the brokering deal; Pittsburgh Corning and the rail transport company received the bulk of the Navy's $10,905.68 payment.

---

[2] All of plaintiffs' objections to the declarations Metalclad submitted in support of its motion, including Heflin's declaration, were overruled, and plaintiffs have not challenged any of these evidentiary rulings on appeal.

During the 1970's, Kase worked shoulder to shoulder on the USS Drum, USS Pintado, USS Guitarro, and USS Hawkbill with those who were cutting, installing, removing and disturbing Unibestos. He also personally assisted in loading boxes of Unibestos onto those vessels.

Kase and his wife filed suit against Metalclad and numerous other entities in December, 2011, asserting claims based on his asbestos exposure. After answering the complaint, Metalclad moved for summary judgment or summary adjudication on two grounds: the government contractor defense precluded the design defect claims (*Boyle*, *supra*, 487 U.S. at p. 500), and there was no triable issue as to causation as to the failure to warn claims (i.e., an asbestos warning by Metalclad would have been impossible and futile).[3]

As to Kase's design defect claims, the trial court ruled: "The United States government approved precise specifications for the Metalclad-supplied Unibestos used aboard the USS Guitarro, USS Pintado, USS Drum, and USS Hawkbill; the Metalclad-supplied Unibestos conformed to the government's specification; and Metalclad had no duty to warn the government because the government was well aware of the potential hazards of asbestos. Further, Pittsburgh Corning, the manufacturer of the Unibestos supplied by Metalclad, provided warnings on the packaging of the Unibestos." (Italics omitted.)

As to his failure to warn claims, the trial court ruled: "Metalclad presented uncontroverted evidence that a warning was provided on the boxes of Unibestos by the manufacturer Pittsburgh Corning, but that warning did not prevent Plaintiff Gary Kase from exposure . . . . [¶] . . . [¶] A warning given by Metalclad would not have affected how the Unibestos was used by the Navy, or prevented Mr. Kase's alleged exposure. As a matter of law, any failure to warn by Metalclad was not a substantial factor in causing Mr. Kase's alleged exposure to asbestos from Unibestos insulation."

---

[3] Because the loss of consortium claims are dependent on the viability of Kase's negligent design and failure to warn claims, we hereafter refer only to Kase in the singular.

The court, thus, granted Metalclad's motion and entered judgment in its favor.

## II. DISCUSSION[4]

### A. *The Government Contractor Defense Set Forth in Boyle*

*Boyle* arose from a helicopter crash in which a Marine copilot drowned because he could not escape from the aircraft, allegedly because of a poorly designed escape hatch mechanism by which the hatch opened outwards, instead of inwards, and thus against the weight of the water. (*Boyle*, *supra*, 487 U.S. at pp. 502–503.) The aircraft manufacturer invoked what had become known as the government contractor defense, arguing it had followed military specifications in constructing the hatch. (*Boyle*, *supra*, at p. 503.)

The Supreme Court both endorsed and outlined the requirements of the defense. It first described federal procurement from third parties as involving a "uniquely federal interest," observing "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of the United States will be directly affected." (*Boyle*, *supra*, at p. 507.)

The fact government procurement is an area of uniquely federal interest will not, alone, however, support a defense for the contractor. State law, ruled the high court, will be displaced only when "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law.' " (*Boyle*, *supra*, 487 U.S. at p. 507, quoting *Wallis v. Pan American Petroleum Corporation* (1966) 384 U.S. 63, 68.) The court provided the following illustration of when there would be no "significant conflict"

---

[4] Our standard of review is well established. Summary judgment is appropriate only if the evidence discloses no triable issue of material fact and the moving party is entitled to prevail as a matter of law. We therefore review a grant of summary judgment de novo, independently reviewing the trial court record and viewing the evidence in the light most favorable to the losing party. (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 178.) "Whether the facts establish the conditions for the military contractor defense," however, "is generally a question of fact for the jury." (*Jackson v. Deft, Inc.* (1990) 223 Cal.App.3d 1305, 1313 (*Jackson*), citing *Boyle*, *supra*, 487 U.S. at p. 514.)

between federal interests and the application of state tort law: "If, for example, the United States contracts for the purchase and installation of an air conditioning-unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer of such units a duty of care to include a certain safety feature would not be a duty identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care." (*Boyle*, at p. 509.)

The case before it, said the Supreme Court, was entirely different. (*Boyle*, *supra*, 487 U.S. at p. 509.) "[T]he asserted basis of the contractor's liability (specifically, the duty to equip helicopters with the sort of escape-hatch mechanism petitioner claims was necessary) is precisely contrary to the duty imposed by the Government contract (the duty to manufacture and deliver helicopters with the sort of escape-hatch mechanism shown by the specifications)." (*Ibid.*) Thus, there was a significant conflict between the federal government's design requirements and the asserted state law design requirement.

The Supreme Court went on to posit a variation of the helicopter scenario that would not support the defense. "If, for example, a federal procurement officer orders, by model number, a quantity of stock helicopters that happen to be equipped with escape hatches opening outward, it is impossible to say that the Government has a significant interest in that particular feature. That would be scarcely more reasonable than saying that a private individual who orders such a craft by model number cannot sue for the manufacturer's negligence because he got precisely what he ordered." (*Boyle*, *supra*, 487 U.S. at p. 509.)

The court then turned to identifying the appropriate "limiting principle to identify those situations in which a 'significant conflict' with federal policy or interests" arises. (*Boyle*, *supra*, 487 U.S. at p. 509.) The court of appeals had concluded it was the *Feres*[5] doctrine, which excludes injuries to military personnel from the Federal Tort Claims Act (FTCA). Military contractor liability would conflict with this doctrine, the circuit court

---

[5] *Feres v. United States* (1950) 340 U.S. 135 (*Feres*).

9

reasoned, since a pass-through of state tort liability costs in federal contracting would " 'defeat the purpose of the immunity for military accidents conferred upon the government itself.' " (*Boyle*, at p. 510, quoting *Tozer v. LTV Corp.* (4th Cir. 1986) 792 F.2d 403, 408.)

The Supreme Court rejected the *Feres* doctrine as the undergirding of the government contractor defense, however, on the ground it would produce results both too broad and too narrow. Too broad, because the government contractor defense would apply whenever the *Feres* doctrine precluded suit against the government, and "then even injuries caused to military personnel by a helicopter purchased from stock (in our example above), or by any standard equipment purchased by the Government, would be covered." (*Boyle*, *supra*, 487 U.S. at p. 510.) Too narrow, because the *Feres* doctrine applies only to military personnel and therefore government contractors would be liable to a civilian even when the agent of harm is clearly of paramount federal concern. (*Boyle*, at pp. 510–511.)

The high court determined the FTCA, itself, provided a better guide for determining what is a " 'significant conflict' between federal interests and state law in the context of Government procurement." (*Boyle*, *supra*, 487 U.S. at p. 511.) The key is the statute's exemption for " 'discretionary function[s].' " (*Ibid.*) "[T]he selection of the appropriate design for military equipment to be used by our Armed Forces," said the court, "is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness." (*Ibid.*) "[P]ermitting 'second-guessing' of these judgments [citation] through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption" for discretionary functions. (*Ibid.*) "The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs." (*Id.* at pp. 511–512.)

The court then adopted the three-prong test several circuit courts had used to determine when the defense applied, the requirements being: "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." (*Boyle*, *supra*, 487 U.S. at p. 512.) The first two requirements, said the court, insure "the suit is within the area where the policy of the 'discretionary function' would be frustrated"— that is, they insure "that the design feature in question was considered by a Government officer, and not merely by the contractor itself." (*Ibid.*; see *Jowers v. Lincoln Elec. Co.* (5th Cir. 2010) 617 F.3d 346, 352–354 [defense does not include a fourth, "significant conflict," requirement, as that is determined through the first two requirements].)

The court expressly rejected a formulation that would have allowed the defense "only if (1) the contractor did not participate, or participated only minimally, in the design of the defective equipment; *or* (2) the contractor timely warned the Government of the risks of the design and notified it of alternative designs reasonably known by it, *and* the Government, although forewarned, clearly authorized the contractor to proceed with the dangerous design." (*Boyle*, *supra*, 487 U.S. at p. 513.) This was not a formulation, explained the court, "designed to protect the federal interest embodied in the 'discretionary function' exemption." (*Ibid.*) "The design ultimately selected may well reflect a significant policy judgment by Government officials whether or not the contractor rather than those officials developed the design." (*Ibid.*)

Having established the parameters of the defense, the Supreme Court reversed and remanded for the circuit court to clarify whether it had determined that no reasonable juror could find other than that government contractor defense applied. (*Boyle*, *supra*, 487 U.S. at p. 514.)

## B.  Design Defect Claims

### 1.  Reasonably Precise Specifications

In urging reversal of the summary judgment on his design defect claims, Kase focuses primarily on the first requirement of the government contractor defense—that the

"United States approved reasonably precise specifications" pertaining to the alleged design defect (i.e., asbestos in the insulation Metalclad supplied to the naval shipyard). (*Boyle*, *supra*, 487 U.S. at p. 512.)

Kase repeatedly points out that while the Navy studied and rigorously tested Unibestos, it did not design or manufacturer the insulation. According to Kase, Unibestos is a common commercial product, no different from the air conditioner or "stock" helicopter to which the United States Supreme Court referred in *Boyle*. He thus contends there is a triable issue as to whether the insulation is "military equipment," the procurement of which was a discretionary function within the meaning of *Boyle*.

Kase relies on *Hawaii*, *supra*, 960 F.2d 806, in which the Ninth Circuit affirmed the district court's refusal to allow defendants who had supplied asbestos insulation products to the Navy to assert the government contractor defense against state strict liability claims. In light of the Supreme Court's repeated use of the phrase "military equipment" and examples of procurements that would not involve a discretionary function, the circuit court concluded "[w]here the goods ordered by the military are those readily available, in substantially similar form, to commercial users, the military contractor defense does not apply." (*Id.* at p. 811.) Confining the defense to contractors "only in respect to the military equipment they produce for the United States," said the circuit court, is also consistent with its purposes—that, unless protected, contractors might either refuse to build or supply such equipment, or increase the costs to do so. (*Ibid.*) It was the court's view that "[t]hese same concerns do not exist with respect to products readily available on the commercial market." (*Ibid.*) Thus, the "fact that the military may order such products does not make them 'military equipment.'" (*Ibid.*) Such products "have not been developed on the basis of involved judgments made by the military," and they already carry prices in their sale to commercial users that reflect the cost "of ordinary tort liability." (*Ibid.*)[6]

---

[6] Federal district courts within the Ninth Circuit have, of course, followed *Hawaii* and ruled the defense unavailable to defendants, including Metalclad, in other cases involving asbestos-containing insulation procured for the Navy. (E.g., *Moore v. Asbestos*

12

Other courts, however, including two California courts, have concluded the government contractor defense can apply when the federal government procures a commercially available product.

In *Jackson*, *supra*, 223 Cal.App.3d at page 1305, another division of this court reversed a defense summary judgment on the ground there were triable issues "concerning the existence of a substantial conflict between a federal interest and a state law." (*Id.* at p. 1317.) The court focused on evidence that the naval specifications for weather resistant, polyurethane paint products did not appear to preclude additional warnings. (*Id.* at pp. 1316–1317.) The court expressly declined to rule, however, that because approximately 20 percent of the paint products were sold commercially, the products were not "military equipment." "Plaintiff seems to argue that military equipment means a product made exclusively for military use with no commercial

---

*Defendants (B\*P)* (N.D.Cal., July 1, 2010, No. CV 10-01638 RS) 2010 WL 2650487, at p. *4 [granting motion to remand to state court because Metalclad did not establish "colorable" government contractor defense; while Unibestos was produced according to military specifications and possessed specific qualities that served a military purpose, no evidence that the "brokered Unibestos was created to fulfill a unique military need"]; *Fong v. Asbestos Defendants (B\*P)* (N.D.Cal., Apr. 15, 2010, No. C10-0287 TEH) 2010 WL 1526099, at pp. *1–*2 [Metalclad did not establish "colorable" defense because Unibestos was also sold commercially]; *Delahaye v. Asbestos Defendants* (N.D.Cal., Jan. 25, 2010, No. C 09-05504 JSW) 2010 WL 366611, at p. *4 [same; no evidence "indicating that the military had direct and detailed control over the design and manufacturing of Unibestos"]; see *Redman v. A.W. Chesterton Company* (N.D.Cal., Nov. 25, 2008, No. 08-03013 JSW) 2008 WL 5048205, at pp. *2–*3 [denying motion to remand because manufacturer of marine distilling units established colorable defense where Navy controlled asbestos warnings on the units, making them different from those sold commercially; "rationale" behind defense "is to eliminate liability for contractors that are merely following the U.S. Navy's directions, not to eliminate liability for contractors that sell products to the U.S. Navy that are substantially similar to their commercial counterparts"]; compare *Leite v. Crane Co.* (D.Hawaii 2012) 868 F.Supp.2d. 1023, 1027–1034, 1038 [denying motion to remand because manufacturer of "asbestos products" established "colorable" defense; some specifications "required" use of asbestos and declaration "describing the reasoning for using asbestos in insulation for Navy ships"].)

13

purpose; however, plaintiff cites no case espousing that extreme position.[7] In our view, if a product is produced according to military specifications and used by the military because of particular qualities which serve a military purpose, and is incidentally sold commercially as well, that product may nonetheless still qualify as military equipment under the military contractor defense." (*Id.* at p. 1319.) Accordingly, the fact the polyurethane paint "was also sold commercially" did not "absolutely foreclose application of the military contractor defense." (*Ibid.*)

In *Oxford*, *supra*, 177 Cal.App.4th at page 700, our division reversed a judgment for the plaintiffs on inconsistent verdict grounds because the jury's special findings established the government contractor defense as to design defect but not as to failure to warn, and it could not be determined whether the jury based its general verdict on strict liability or negligent failure to warn. In so concluding, the court rejected the plaintiffs' assertion that the boilers at issue, which incorporated asbestos products and were sold to the Navy for use on warships, did not qualify as "military equipment" because similar boilers were sold commercially. (*Id.* at pp. 709–711.) The court distinguished *Hawaii* on the ground the evidence in that case showed the insulation was "sold primarily to civilian petroleum companies" and there was no evidence the military "had provided any design specifications." (*Oxford*, at pp. 709–710.) "[I]n contrast, the boilers made by defendant were designed pursuant to exceedingly detailed and precise military specifications that required the use of asbestos in many instances." (*Id.* at p. 710.) The court also cited to *Jackson* and agreed *Hawaii*'s limitation of the defense "to products that are made exclusively for the military" is "unduly confining." (*Oxford*, at p. 710.) In fact, observed the *Oxford* court, other courts had held the defense is not even limited to military contracts. (*Ibid.*, citing *Carley v. Wheeled Coach* (3d Cir. 1993) 991 F.2d 1117, 1119, fn. 1 [defense applied to contract for ambulance procured by General Services Administration for Virgin Islands Department of Health]; see *In re Katrina Canal Breaches Litigation* (5th Cir. 2010) 620 F.3d 455, 459–465 [considering defense in

---

[7] We note that *Jackson*, decided in 1990, predates *Hawaii*, decided in 1992.

connection with levee construction contracts with U.S. Army Corps of Engineers; summary judgment reversed because of insufficiently detailed back-fill and compaction specifications]; *Bennett v. MIS Corp.* (6th Cir. 2010) 607 F.3d 1076, 1089–1090 [joins other circuit courts holding defense can apply in "the non-military context"].)

We continue to agree with *Jackson* and *Oxford* that a product's commercial availability does not necessarily foreclose the government contractor defense. As the United States Supreme Court took care to point out in *Boyle*, the *selection* of a particular design may reflect a "significant policy judgment" by government officials, "whether or not the contractor rather than those officials developed the design." (*Boyle*, *supra*, 487 U.S. at p. 513.) The court further explained that the first requirement of the defense—reasonably precise specifications—insures "that the design feature in question was *considered* by a Government officer, and not merely by the contractor itself." (*Id.* at p. 512, italics added.)

The examples the Supreme Court provided as to when the defense would not apply also illuminate the point. The first was a contract for the purchase and installation of an air conditioner that specified only cooling capacity and "not the precise manner of construction." (*Boyle*, *supra*, 487 U.S. at p. 509.) Air conditioners, of course, are usually commercially available products—but that was not the reason given by the court for the inapplicability of the defense. Rather, the defense was inapplicable because the procurement was not governed by any design specifications, either issued or reviewed by the government, let alone, reasonably precise specifications reflecting the exercise of a discretionary function in connection with the design of the unit. The second example was the "stock" helicopter ordered by the manufacturer's model number. (*Ibid.*) A stock helicopter is also, by definition, a commercially available product. But again, that was not the reason stated by the court for the inapplicability of the defense. Rather, the posited acquisition involved no specifications at all, a scenario in which it was "impossible to say that the Government has a significant interest" in any aspect of the design of the aircraft. (*Ibid.*)

15

In short, *Hawaii* failed to acknowledge that the Supreme Court in *Boyle* (a) expressly rejected a formulation of the defense that would have excluded any contractor that participated in the design of the procured item and (b) made clear that a "design ultimately *selected*" by the government, including one conceived by the contractor, "may well reflect a significant policy judgment by Government officials whether or not the contractor rather than those officials developed the design." (*Boyle*, *supra*, 487 U.S. at p. 513, italics added.)

In a more recent decision, moreover, *Getz v. Boeing Co.* (9th Cir. 2011) 654 F.3d 852, the Ninth Circuit stated "it ma[de] no difference" to its analysis that the contractor supplying computer controls for an Army helicopter engine had previously developed "a similar engine control system" for Great Britain's air force. (*Id.* at p. 863.) While the government contractor defense would not apply to the procurement " 'by model number, [of] a quantity of stock helicopters that happen to be equipped with' a particular design feature [citation omitted], this defense does not require the government to create the design or the specifications. As long as the United States makes a 'significant policy judgment' in approving the design, nothing precludes the government from procuring designs and products that were initially developed for other nations." (*Ibid.*, quoting *Boyle*, *supra*, 487 U.S. at pp. 509, 513.) Accordingly, the circuit court focused in *Getz* on (a) the detailed specifications, created by the manufacturer, which included specific reference to the allegedly defective ignition control and (b) the Army's review of the manufacturer's "design analyses, reports, and test plans" and participation in design meetings. (*Getz*, at pp. 861–862.) It was "clear" that the Army's approval of the manufacturer's design "resulted from careful deliberation" and was not a " 'rubber stamp.' " (*Id.* at p. 861.)

Other federal courts have also concluded that, under *Boyle*, it is proper to focus on whether the government, with due deliberation, *selected* the design feature at issue, not on whether the government or the contractor developed that feature in the first instance. (E.g., *Brinson v. Raytheon Co.* (11th Cir. 2009) 571 F.3d 1348, 1356–1357 [that manufacturer of training aircraft "independently designed" and patented trim aid device

16

and that allegedly defective "rod[s]" in the device were " 'off the shelf' " items, did not change the fact the design involved a " 'back and forth' process" and the government "approved the inclusion of the pushrod into a unique and critical component"]; *Miller*, *supra*, 275 F.3d at p. 419 & fn. 2 [observing in Agent Orange case, that "no court has held that the supplier of an off-the-shelf item is ineligible for protection under the military contractor defense," and, in any event, fact contractor has provided "an off-the-shelf product would be relevant to the first element" of the defense]; *Kerstetter v. Pacific Scientific Company* (5th Cir. 2000) 210 F.3d 431, 435 ["government need not prepare the specifications to be considered to have approved them"]; *In re Brooklyn Navy Yard Asbestos Litigation* (2d Cir. 1992) 971 F.2d 831, 839 [affirming district court's partial summary judgment on design defect claims where district court found the "asbestos products" were " 'furnished according to specifications and were essentially off the shelf items' "]; cf. *In re Agent Orange Product Liability Litigation* (2d Cir. 2008) 517 F.3d 76, 90 (*Agent Orange*) [defense does not apply where government " 'merely rubber stamps' " or " 'merely orders a product from stock' "; "[i]f the government buys a product 'off-the-shelf'—'as-is,' " the government is "merely an incidental purchaser" and the "seller was not following the government's discretionary procurement decisions"].)

Indeed, the Pennsylvanian-based federal district court in *Brown*, *supra*, 2012 WL 7761205, granted summary judgment to Metalclad in a case transferred from the Northern District of California and involving essentially the same failure to warn claims and arguments based on *Hawaii* Kase advances here, including that the asbestos supplied by Metalclad was not "military equipment" as to which the government contractor defense can be asserted. (*Brown*, at p. *1; see *Delahaye v. Asbestos Defendants*, *supra*, 2010 WL 366611, at p. *4 [referring to California trial court ruling in favor of Metalclad on the defense and stating "California courts have rejected the holding of *In re Hawaii*," citing *Oxford*, *supra*, 117 Cal.App.4th 700].)

We therefore turn to the evidentiary showing made in this case as to the Navy's involvement with the procured product, Unibestos.

17

Metalclad submitted evidence of (1) 1922 and 1939 medical manuals in which the Navy acknowledged working with asbestos-containing materials was hazardous and recommended measures to prevent airborne exposure; (2) a 1941 article authored by a Navy captain that discussed asbestos, and the condition known as asbestosis, as a hazard at shipyards; (3) a 1943 Navy-approved set of minimum standards for mitigating the risks of handling asbestos products; (4) a 1944 letter suggesting amosite asbestos was an essential insulating material with no substitute and workers should use respirators to mitigate hazards; (5) a series of Navy reports, starting in 1955, showing awareness of asbestos exposure risks and proposing thresholds for exposure; (6) a 1964 Navy study showing awareness of the harm being done to insulation workers from a variety of asbestos types at Navy shipyards and an awareness of the medical literature about asbestos; (7) a 1968 report on asbestos exposure at Puget Sound Naval Shipyard; and (8) Navy reports during the 1969 timeframe documenting the Navy's own ongoing investigations of asbestos hazards and its staying abreast of civilian research on the subject. All of these studies lead to measures in the 1970's to reduce or eliminate asbestos exposure, such as the 1971 and 1973 changes to specification MIL-I-2781. (See *Oxford*, *supra*, 177 Cal.App.4th at pp. 705–706 [recounting evidence of Navy's study and awareness of health hazards associated with asbestos products].)

Metalclad additionally presented evidence that before 1955, Navy specifications for insulation expressly called out for asbestos. In 1955, the Navy issued specification MIL-I-2781, defining grades of insulation (each grade reflecting different shield temperatures), specifying the size and shape of compliant insulation, and defining various physical requirements to be confirmed by testing (maximum density, thermal conductivity, weight loss after tumbling, modulus of rupture, and changes after soaking heat). Compliant insulation had to be "composed of heat resisting compounds suitable for the temperature conditions and the purpose intended." A 1967 Naval ships technical manual described qualifying "[t]hermal insulation pipe covering, Military Specification MIL-I-2781, grade II, class c" (i.e., Unibestos) as "a uniform mixture of amosite asbestos fibers . . . held together with a sodium silicate . . . binder. Every Qualified Products List

(QPL) in the record for MIL-I-2781, from 1951 through 1969, listed only Unibestos for grade II-class c, and grade III-class f pipe insulation. Specification MIL-I-24244, also in effect in 1968 and applicable specifically to "mineral-based thermal insulation," imposed "special corrosion and chloride requirements" and additional quality conformance tests.

Metalclad's expert in Navy ship design and construction, Dan Heflin, Jr., declared, based on his "personal knowledge of military specifications and review of documents . . . , it is my opinion that in order to meet the needs expressed in MIL-l-24244, a product that contained asbestos was *required*." (Italics added.)

Thus, this case deals with the procurement of a product that was known to and studied by the Navy for decades and which the Navy knew carried with it serious health risks. Yet, it nevertheless made a decision to use, and to continue using, this asbestos product in its naval vessels until the 1970's. (See *Agent Orange*, *supra*, 517 F.3d at pp. 94–96 [government exercised the necessary discretion, and created a significant conflict with state law, when it ordered and reordered product with knowledge of the alleged design defect; "reordering the same product with knowledge of its relevant defects plays the identical role in the defense as listing specific ingredients, processes, or the like"]; *Dowd v. Textron, Inc.* (4th Cir. 1986) 792 F.2d 409, 410–412 [concluding pre-*Boyle* government contractor defense available where Army investigated problem with rotor system, manufacturer suggested modifications, but Army continued to use same system; continued use "amply establish[ed] government approval of the alleged design defects"].)

As Kase points out, the Navy's purchase order issued to Metalclad did not expressly call out for asbestos in the requisitioned insulation, but rather, referenced specifications MIL-I-2781 and MIL-I-24244. The record evidence is uncontroverted, however, that to comply with these specifications an asbestos-containing insulation was required. Indeed, the only then prequalified product in the demanded insulation grades with the demanded fibrous composition was asbestos-containing Unibestos.

Thus, on this record, Metalclad could not comply with both its contractual obligation to the Navy and the state tort duty Kase claims should have controlled the

19

design of the product.  In other words, Metalclad has presented a record that the government "made it" deliver asbestos-containing insulation.  (See *In re Joint E. and S. Dist. New York Asbestos Lit.* (2d Cir. 1990) 897 F.2d 626, 632, 634, fn. 7 ["Stripped to its essentials, the military contractor defense under *Boyle* is to claim, 'The government made me do it.' "]; whether asbestos-containing cement was "[a] 'stock' item, analogous to the hypothetical stock helicopter" in *Boyle* could not be decided on record before the circuit court]; see *Ruppel v. CBS Corp.* (7th Cir. 2012) 701 F.3d 1176, 1184 (*Ruppel*) [manufacturer of asbestos-containing turbine for aircraft carrier established "colorable" government contractor defense where use of asbestos was required, "making it impossible to comply with the Navy and state tort law simultaneously"].)

The procurement of the asbestos-containing insulation at issue here is not, contrary to Kase's assertion, akin to the purchase of the specific-capacity air conditioner or the "stock" helicopter posited in *Boyle*.  Neither of the Supreme Court's exemplar purchases involved a background remotely similar to the Navy's history with asbestos.  This is not a case where the procured insulation merely "happen[ed]" to include asbestos, in contrast to the hypothetical defective latch that merely "happen[ed]" to be on the "stock" helicopter ordered by the manufacturer's model number.  (*Boyle*, *supra*, 487 U.S. at p. 509.)  The Navy's continued requisition of asbestos containing products in the face of extensive study as to asbestos's protective attributes, on the one hand, and its serious health risks, on the other hand, cannot be described as anything other than a deliberative judgment call—a quintessential discretionary function.

Nor can we view the operative specifications, MIL-I-2781 and MIL-I-24244, as Kase urges, as merely performance specifications unrelated to the alleged design flaw.  Performance requirements can mandate a design choice, and the uncontroverted evidence is that it did so in this case.  (See *Oliver v. Oshkash Truck Corp.* (7th Cir. 1996) 96 F.3d 992, 998–999 (*Oliver*) [through "performance and dimension specifications" Army exercised "considerable amount of substantive input into the design" of overland vehicle].)

20

In sum, all the benchmarks of "reasonably precise specifications" are present—the Navy made a deliberative design choice in issuing specifications that, in 1968, could only be met with, and thus required, asbestos-containing insulation for the protection of piping in the reactor compartments of its nuclear submarines.[8]

### 2. *Navy's Knowledge of Asbestos Health Hazards*

Kase maintains there is also a triable issue as to the third requirement of the government contractor defense—that the defendant "warned the United States about the dangers in the use of the [product] that were known to the supplier but not to the United States." (*Boyle*, *supra*, 487 U.S. at p. 512.) No warning must be made, however, when the United States is already aware of the danger at issue. (*Ibid.*)

We have already summarized the evidence regarding the Navy's extensive knowledge of the health risks of asbestos products. Metalclad's expert, Robert Strode, declared "the Navy's resources and knowledge regarding asbestos hazards and controls during the late 1960's and early 1970's would have represented the state of the art, and there is no basis to conclude that an insulation contractor such as Metalclad Insulation Corporation would have had any information or knowledge concerning asbestos insulation hazards that was not already known to the U.S. Navy." Metalclad's discovery responses, in turn, show it only first became aware of any connection between asbestos exposure and disease in the late 1960's. This evidence, which was uncontroverted, reflects that the Navy was well aware of the health risks of asbestos well before its 1968 procurement from Metalclad and Metalclad's knowledge lagged behind the Navy's.

---

[8] We recognize this is not a case involving substantial "back and forth" between a government agency and a contractor designing a unique piece of equipment, such as an aircraft or transport vehicle. (Compare, e.g., *Oliver*, *supra*, 96 F.3d at pp. 998–1000; *Harduvel v. General Dynamics Corp.* (11th Cir. 1989) 878 F.2d 1311, 1320–1321.) No case involving that scenario, however, has involved the decades of naval studies and investigations, and the history of naval specifications, unique to the universe of asbestos cases. (See, e.g., *In re Brooklyn Navy Yard Asbestos Litigation*, *supra*, 971 F.2d at p. 839; *Oxford*, *supra*, 177 Cal.App.4th at pp. 705–706.)

Kase nevertheless maintains Metalclad was required to show (a) that at the time of contracting it independently ascertained the extent of the Navy's knowledge of asbestos health risks and (b) exactly what it knew at that time about asbestos health risks. Only by making that two-fold showing, says Kase, can Metalclad demonstrate it had no duty to advise the federal government about asbestos health risks.

Kase cites no authority requiring such a detailed showing. Rather, the cases recognize that a contractor "can demonstrate a fully informed government decision by showing either that they conveyed the relevant known and 'substantial enough' dangers . . . *or* that the government did not need the warnings because it already possessed that information." (*Agent Orange*, *supra*, 517 F.3d 76, 99, italics added; see, e.g., *Stout v. Borg-Warner Corp.* (5th Cir. 1991) 933 F.2d 331, 336 [contractor "only had the duty to warn the government of dangers of which the government had no knowledge" and failure to warn of obvious or known risks did not defeat defense]; *Ramey v. Martin-Baker Aircraft Co. Ltd.* (4th Cir. 1989) 874 F.2d 946, 951, fn. 10 ["Because we conclude the Navy was already aware of the risk at issue, we need not consider whether Martin-Baker would otherwise have been required to warn the Navy directly of the risk in order to assert successfully the military contractor defense."].)

The evidentiary record in this case amply makes a prima facie case that the Navy was well aware of the health risks of asbestos and Metalclad was not aware of any risk of which the Navy was not already aware. (See *Ruppel*, *supra*, 701 F.3d at p.1185 ["colorable" defense where manufacturer of asbestos-containing turbines provided evidence "Navy knew of all of the hazards associated with asbestos"]; *Brown*, *supra*, 2012 WL 7761205, at p. *1, fn. 1 [summary judgment granted where Metalclad's evidence that Navy "knew about asbestos and its hazards" was uncontradicted].) Kase, in turn, presented no contrary evidence raising a triable issue. (See *Borrayo v. Avery* (2016) 2 Cal.App.5th 304, 308 [once prima facie showing is made, burden shifts to party opposing summary judgment to present evidence raising a triable issue].)

We therefore conclude Kase has not raised a triable issue as to the requirements of the government contractor defense as to his design defect claims.

22

## C. Failure to Warn Claims

California recognizes "failure to warn claims under both strict liability and negligence theories. In general, a product seller will be strictly liable for failure to warn if a warning was feasible and the absence of a warning caused the plaintiff's injury. [Citations.] Reasonableness of the seller's failure to warn is immaterial in the strict liability context." (*Webb v. Special Elec. Co., Inc.* (2016) 63 Cal.4th 167, 181, fn. omitted.) "Under the 'warning defect' theory of strict liability, a perfectly made product is defective if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning or if no warning is given." (*Oxford*, *supra*, 177 Cal.App.4th at p. 717.) "Conversely, to prevail on a claim for negligent failure to warn, the plaintiff must prove that the seller's conduct fell below the standard of care. [Citation.] If a prudent seller would have acted reasonably in not giving a warning, the seller will not have been negligent." (*Webb*, at p. 181.) "In general, the adequacy of the warning is a question of fact for the jury." (*Oxford*, *supra*, 177 Cal.App.4th at p. 717.)

While the government contractor defense can apply to failure to warn claims (see, e.g., *Getz*, *supra*, 654 F.3d at pp. 866–867; *Kerstetter v. Pacific Scientific Co.* (5th Cir. 2000) 210 F.3d 431, 438–439; *Oliver*, *supra*, 96 F.3d at pp. 1003–1004), Metalclad did not invoke it in the trial court as to Kase's failure to warn claims, nor did the trial court consider it. Rather, Metalclad essentially made a causation argument and continues to defend the summary judgment as to Kase's failure to warn claims on that basis.[9]

The evidence on causation was uncontroverted. The purchase order required that every "container" for the insulation be marked in accordance with specification MIL-STD-129D. The "only addition[s]" to the specification markings required by the purchase order, itself, were that the letter " 'N' " and the words " 'TARGET MATERIAL' " appear in three-inch letters. The "shipment" was to be marked with its "delivery destination, contract number and its DMN or 'Document Management

---

[9] Metalclad also urges the government contractor defense as an alternative ground to affirm the summary judgment. We need not, and do not, reach that issue.

23

Number.' " In addition, the specification required "each package" to contain the following: "Federal Stock Number, Item Description or Nomenclature, Contract Number, Name and Address of Prime Contractor, Quantity and Unit; Level of Protection, Packing Date, Gross Weight, Volume, and Delivery Address." Although the specification permitted preprinted " 'case markings' " on the commercial packaging, it did not permit additional markings to be placed on "shipping containers," as such markings could have been "mistaken for any of the required markings and were thus not permitted." Metalclad's expert, Thomas F. McCaffery, agreed "case markings . . . could conceivably include a warning label printed on the boxes of Unibestos by its manufacturer." He also acknowledged "Pittsburgh Corning . . . began printing a warning on boxes of Unibestos in November 1968." However, a Pittsburgh Corning employee could not confirm the November 1968 timeframe, and said the package warnings could have commenced the month before or the month after. In any case, Metalclad never had physical custody of the Unibestos. The order was shipped from the Pittsburgh Corning Texas facility by rail, directly to the naval shipyard.

Kase, for his part, never claimed to have seen any of the shipping containers for Unibestos. Rather, he recalled seeing stored "cardboard boxes" of Unibestos that were subsequently carried to the submarines on which he was working. He did not see any warnings on the individual boxes of insulation.

Since the evidence is uncontroverted that Metalclad never had possession of the Unibestos and there is no evidence Kase ever saw a shipping container, the question as we see it is whether there is any substantial evidence raising a triable issue that Metalclad could have required Pittsburgh Corning to place a warning label on each box of the product before Pittsburgh Corning commenced doing so itself.

Kase points to the deposition testimony of the Pittsburgh Corning employee referenced above, who confirmed the order from Metalclad included the following directive: " 'Mark cartons as follows in addition to normal marking,' " specifically, "DMI, space, 5640[-]199[-]5660 contract number N00445[-]70[-]C[-]0260, Metalclad Insulation Corporation, Torrance, comma, California." Kase asserts that if Metalclad

24

could give this direction as to each package (i.e., essentially requiring the packaging to comply with the naval specification), it also could have told Pittsburgh Corning to include a warning. However, whether Metalclad could have done so, and equally importantly, whether Pittsburgh Corning could have, or would have, done so is sheer speculation. There is no evidence from anyone from Metalclad on these issues. And the Pittsburgh Corning employee, when asked whether anything prevented Metalclad from making such a request, said he did not know. It is certainly true Pittsburgh Corning commenced placing warnings on its packaging by at least December 1968. There is absolutely no evidence, however, as to whether it had the production capability to do so before that time, or whether, even if it had the capability to do so, it would have done so, given that the naval specifications did not require a warning.

We, thus, conclude that the fact Metalclad's order directed Pittsburgh Corning to supply the information required by the naval shipping specification, by itself, is not sufficient to raise a triable issue as to causation. There simply is no evidence as to whether Metalclad could have directed Pittsburgh Corning to place an asbestos warning on the boxes of Unibestos, or whether Pittsburgh Corning could have, or would have, complied with such a request. On this record, these are matters of speculation, which does not, and cannot, raise a triable issue.[10] (See *Burgueno v. Regents of the University of California* (2015) 243 Cal.App.4th 1052, 1057 ["[A] party ' "cannot avoid summary judgment by asserting facts based on mere speculation and conjecture . . . ." ' "].)

### D. *Punitive Damages and Loss of Consortium Claims*

The trial court granted summary judgment on Kase's punitive damages claims mainly because it rejected his defective design and failure to warn claims on the merits. We need not, and do not, reach the issue of punitive damages for the same reason. In any case, on appeal, Kase barely mentions punitive damages. In his opening brief, he makes only cursory assertions, provides no citations to the record and cites no supporting

---

[10] Given our conclusion on this point, we need not, and do not, address any of Metalclad's other arguments related to causation.

25

authority.  In his closing brief, he makes no mention at all of punitive damages.  Under these circumstances, he has forfeited review of the issue, regardless of our disposition on the merits of his claims.  (See *Garcia v. Seacon Logix, Inc.* (2015) 238 Cal.App.4th 1476, 1489 [appellate arguments must be supported by citations to record and to legal authority whenever possible, and failure to do so may forfeit argument]; *People ex rel. Strathmann v. Acacia Research Corp.* (2012) 210 Cal.App.4th 487, 502–503 [failure to cite to record forfeits issue; court does not search record in search of evidence supporting appellant].)

The trial court, likewise, granted summary judgment on Kase's wife's loss of consortium claims because they depend on the viability of Kase's defective design and failure to warn claims.  Given our disposition upholding the trial court's summary judgment on Kase's claims, we also uphold the summary judgment on the loss of consortium claims.

### III.  DISPOSITION

The summary judgment is affirmed.  Respondent to recover costs on appeal.

_____
Banke, J.

26

We concur:

_____
Margulies, P.J.

_____
Dondero, J.

A143590, *Kase et al. v. Metalclad Insulation Corp*

27

Trial Court:  San Francisco City and County Superior Court

Trial Judge: Hon. Teri L. Jackson

Counsel:

Brayton Purcell, LLP, Gary L. Brayton and Richard M. Grant for Plaintiff and Appellant.

Dentons US LLP, Lisa Lurline Oberg, Felicia Y. Feng and Andrea J. Casalett; Morgan, Lewis & Bockius LLP, Thomas M. Peterson and Deborah E. Quick for Defendant and Respondent.