Filed 12/11/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | C080890 |
| Plaintiff and Respondent, | (Super. Ct. No. CM037930) |
| v. | |
| ANTHONY PAUL MAXWELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Butte County, Robert A. Glusman, Judge.  Affirmed as modified.

Peggy A. Headley, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Daniel B. Bernstein, Supervising Deputy Attorney General, Jennifer M. Poe, Deputy Attorney General, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts B and C of the Discussion.

1

A jury convicted defendant Anthony Paul Maxwell of unlawfully possessing methadone, possessing drug paraphernalia, and, on two occasions, possessing heroin with the intent to sell it. The trial court afterward found true several allegations that lengthened the sentence for these offenses, including that defendant had a prior "strike" conviction, served a prior prison term, and committed one of the offenses while out on bail on another offense. The court sentenced defendant to 13 years in prison.

Defendant now appeals his conviction and sentence on several grounds. He contends the trial court wrongly denied his two motions to suppress evidence. He asserts the court wrongly instructed the jury about "uncharged offenses"—that is, offenses that were discussed but not charged in this case. And he alleges the court wrongly imposed several sentencing enhancements: an "on bail" enhancement—which the court imposed because defendant committed one of the offenses here while out on bail on another offense—and a prior prison term enhancement—which the court imposed because defendant served a prior prison term shortly before he committed the offenses here.

We agree with defendant in part. A sentencing enhancement for a prior prison term requires, among other things, that the prior prison term be based on a felony conviction. But that was not true of the prior prison term here. Although defendant served this prison term after being convicted of a felony, that felony conviction was reduced to a misdemeanor under Proposition 47 (the Safe Neighborhoods and Schools Act) before sentencing in this case. The trial court thus had no ground for increasing defendant's sentence based on his serving this prior prison term. We modify the judgment to address this error and affirm the judgment as modified.

BACKGROUND

The charges in this case stem from defendant's possession of drugs and drug paraphernalia on several dates in 2012 and 2013.

A.    *December 2012 Charges*

On December 17, 2012, two officers received an anonymous tip about the location of Christy Scarbrough, who at the time had four outstanding arrest warrants and was on searchable probation.[1]  The officers drove to that location in an unmarked car and, shortly after, spotted Scarbrough in the passenger seat of a car.  After Scarbrough exited the car, one officer arrested her and another spoke briefly to the car's driver, defendant.

According to the officer who spoke with him, defendant showed several signs of being a drug user.  In particular, he had several old injection marks on his forearms and a small patch of soot on his pants that, the officer believed, came from the underside of a drug user's "cooking spoon."  In talking to defendant, the officer learned that Scarbrough had left a pack of cigarettes in the car and that defendant had a "criminal history for robbery" and had a knife in the car's trunk.  Based on this information and Scarbrough's searchable probation status, the officer ordered defendant out of his car and searched the car.  During the search, the officer found multiple used hypodermic needles under the driver's seat, a spoon with soot on its underside and brown residue on its inside, a digital scale, multiple cell phones, and several pieces of what the officer believed was black tar heroin.

The officer arrested defendant based on the items in the car and then searched him incident to his arrest, finding $690 in cash, a counterfeit $100 bill, a motel room key, and 0.959 grams of a substance the officer believed was a narcotic.  The officer later, based

---

[1]    According to the trial court, Scarbrough's search conditions required that she "submit to search of drugs, paraphernalia; [her] person, property, residence, vehicle, or any container under [her] control."

on Scarbrough's searchable status, also searched the motel where she and defendant were staying. The officer found, among other things, multiple used and unused hypodermic needles and "large balls of what appeared to be black tar heroin."

Based on these facts, in December of 2012, defendant was charged with possessing heroin with the intent to sell it and with possessing drug paraphernalia.

B.      *September 2013 Charges*

Several months after defendant's arrest in December of 2012, the court released him from custody on bail. At the time of his release, the court imposed only standard bail conditions. But in August of 2013, the court decided to add search conditions to its bail order. It reasoned that "[y]ou don't get to have pending controlled substances cases and not have search conditions." (*In re Maxwell* (Sept. 29, 2014, C075314, C075315) [nonpub. opn.] (*Maxwell*).) It thus added "the requirement that defendant waive his Fourth Amendment rights" to his existing bail order. (*Ibid.*) Defendant "signed an order 'over objection & duress,' accepting bail with search conditions." (*Ibid.*)

We later struck these search conditions in 2014 because, we found, the trial court failed to sufficiently show the search conditions were warranted. (*Maxwell*, *supra*, C075314, C075315.)

But before we did, on September 18, 2013, an officer relied on these conditions to search defendant's person, car, and home. At defendant's home, the officer found, among other things, 44 methadone pills packed in four separate plastic bags.

Based on these pills, in September of 2013, defendant was charged with possessing methadone with the intent to sell it.

C.      *The Prosecution's Consolidated Information*

Defendant's several charges based on the December 2012 and September 2013 searches, and one other offense, were later consolidated into a single case.

According to the consolidated information, defendant possessed heroin with the intent to sell it on December 17, 2012 (Health & Saf. Code, § 11351), possessed drug

4

paraphernalia on December 17, 2012 (*id.*, § 11364.1),[2] possessed methadone with the intent to sell it on September 18, 2013 (*id.*, § 11351), and possessed heroin with the intent to sell it on November 8, 2013 (*id.*, § 11351).

The information also alleged, as to the three possession-for-sale counts, that defendant had a prior strike conviction for robbery (Pen. Code, §§ 211, 667, subds. (b)-(j), 1170.12)[3] and had served a prior prison term (former § 667.5, subd. (b)). It further alleged, as to the two counts based on 2013 conduct, that defendant committed these offenses while out on bail on other felony charges. (§ 12022.1.)

D.      *Court Proceedings*

Before trial, defendant filed two motions to suppress. The first sought to suppress the evidence obtained from the December 17, 2012 search. Defendant argued there, among other things, that Scarbrough's searchable status did not justify the search of his car and the officers lacked probable cause to conduct the search. The second motion sought to suppress the evidence obtained from the September 18, 2013 search. According to defendant's arguments there, because an officer conducted that search based on a search condition that was later found unlawful in *Maxwell*, the search was itself unlawful and evidence obtained from the search needed to be suppressed. The trial court denied both motions.

Following trial, a jury found defendant guilty of possessing heroin for sale on December 17, 2012, possessing drug paraphernalia on December 17, 2012, possessing heroin for sale on November 8, 2013, and possessing methadone on September 18, 2013

---

[2]      Health and Safety Code section 11364.1 was repealed effective January 1, 2015 and reenacted without substantive change in Health and Safety Code section 11364. (Stats. 2014, ch. 331, § 9 [repealed]; Stats. 2011, ch. 738, § 10 [reenacted]; see *People v. Colbert* (1988) 198 Cal.App.3d 924, 928-929 [rule " 'barring prosecution under a repealed statute does not apply when the repealed statute is substantially reenacted' "].)

[3]      Undesignated statutory references are to the Penal Code.

(a lesser included offense to the charge of possessing methadone for sale). The trial court afterward, following a bench trial, found true the allegations that defendant had a prior strike conviction, served a prior prison term, and committed the November 2013 offense while out on bail on the December 2012 offense and one other offense.

The court sentenced defendant to a total of 13 years in prison. For possessing heroin for sale on December 17, 2012 (count 1), the court sentenced him to the upper term of four years, doubled based on his prior strike conviction, for a total of eight years. For possessing heroin for sale on November 8, 2013 (count 3), the court sentenced him to one-third the middle term of three years, doubled based on his prior strike conviction, for a total of two years. For the two remaining convictions, both misdemeanors, the court sentenced him to county jail for one year for possessing methadone (count 2) and six months for possessing drug paraphernalia (count 4), to be served concurrently. Finally, the court sentenced defendant to four additional years in prison based on the several enhancements to counts 1 and 3. It sentenced him to two additional years in prison because he committed the offense charged in count 3 while out on bail on the offense charged in count 1. And it sentenced him to one additional year in prison, on both counts 1 and 3, because he had served a prior prison term. The court, however, stayed execution of this one-year enhancement on count 3.

Defendant timely appealed.

DISCUSSION

A. *Defendant's Motions to Suppress*

Defendant first contends the trial court wrongly denied his motions to suppress the evidence obtained from the searches in December 2012 and September 2013. We consider each motion in turn.

1. *December 17, 2012 Searches*

We begin with the court's denial of defendant's motion to suppress relating to the searches performed on December 17, 2012.

6

Recall that, on that date, defendant was driving a passenger, Scarbrough, who was on searchable probation and had four outstanding arrest warrants. After Scarbrough excited the car, two nearby officers, who were seeking Scarbrough at the time, pulled in front of defendant and walked up to Scarbrough. One officer arrested Scarbrough shortly after and another spoke briefly to defendant. After defendant noted that Scarbrough had left a pack of cigarettes in the car, the officer searched the car and found, among other things, several used hypodermic needles, a digital scale, and several pieces of suspected black tar heroin. The officer arrested defendant based on these items and then searched him incident to his arrest. The officer also later searched the motel where Scarbrough and defendant were staying, and found there, among other things, multiple used and unused hypodermic needles and 25.9 grams of black tar heroin.

Defendant contends all these searches were unreasonable and thus in violation of the Fourth Amendment. He first asserts that the officer had no authority to search his car, rejecting, in the process, the trial court's finding that the officer conducted a lawful search based on Scarbrough's searchable status. He then alleges that, because the search of his car was unlawful, the related searches of his person and the motel were also unlawful.

a. *Background law*

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Although " '[t]he text of the Fourth Amendment does not specify when a search warrant must be obtained,' " courts " 'ha[ve] inferred that a warrant must [usually] be secured,' " "subject to a number of exceptions." (*Birchfield v. North Dakota* (2016) 579 U.S. ___, ___ [195 L.Ed.2d 560, 575].) One of those exceptions is for

7

searches of probationers who have consented in advance to warrantless searches. (*People v. Woods* (1999) 21 Cal.4th 668, 674 (*Woods*).)

The California Supreme Court has had several occasions to consider the permissible scope of a home search based on a probationer's search conditions. In *Woods*, *supra*, 21 Cal.4th 668, for example, police officers searched a house based on the probation status of one of the three residents, and a district attorney later charged all three residents based on the evidence (drugs and guns) uncovered during that search. (*Id.* at pp. 671-673.) The two residents who were not probationers afterward successfully moved to exclude this evidence at the trial level, but the California Supreme Court later reversed. (*Id.* at pp. 671-672.) Relying on the " 'common authority' " theory of consent—which posits that anyone with common or superior authority can consent to a search of the home—the court "concluded that, if others live with a probationer, the shared areas of their residence may be searched based on the probationer's consent, given in advance by agreeing to a search condition." (*People v. Schmitz* (2012) 55 Cal.4th 909, 917 (*Schmitz*).) But the court cautioned that its "holding [wa]s not intended to legitimize unreasonable searches with respect to nonprobationers who share residences with probationers." (*Woods*, at pp. 681-682.) That in mind, it noted a probation search cannot "exceed the scope of the particular clause relied upon," cannot "be undertaken in a harassing or unreasonable manner," and cannot extend beyond "those portions of the residence they reasonably believe the probationer has complete or joint control over." (*Id.* at p. 682.)

Although the California Supreme Court in *Woods* and later cases defined the scope of a home search based on a resident's searchable probation status, the court has yet to consider the scope of a vehicle search based on a passenger's searchable probation status. It has, however, considered this issue in the context of a passenger's *parole* status.

In *Schmitz*, *supra*, 55 Cal.4th 909, the court found an officer who stopped to speak to the driver of a car, and afterward learned the front seat passenger was a parolee, could

lawfully search the backseat of the car for that reason alone. (*Id.* at pp. 913-914.) In reaching this conclusion, the court focused on two considerations. First, it explained, the state has a "substantial" interest in supervising parolees—who, like probationers with search conditions, may be searched without a warrant. (*Id.* at pp. 923-924.) Second, "[o]n the other side of the balance," the court found "a driver has a reduced expectation of privacy with regard to an automobile," particularly "when he allows others to ride in his car, thus ceding some measure of privacy to them." (*Id.* at p. 924.) As the court explained, "[a] front seat passenger, even if only a casual acquaintance of the driver, will likely feel free to stow personal items in available space at his or her feet, in the door pocket, or in the backseat, until they are needed or the journey ends. Even if the driver's personal preferences are otherwise, it is not reasonable to expect that the passengers will always adhere to them. The driver is not necessarily in a position to supervise his passengers at every moment, nor is he in a position to control their every move once they are in the car." (*Id.* at p. 925.) Based on these considerations, the court found an officer may search "those areas of the passenger compartment where the officer reasonably expects that the parolee could have stowed personal belongings or discarded items when aware of police activity." (*Id.* at p. 926.)

One Court of Appeal has since applied similar reasoning to find an officer can also conduct a limited search of a vehicle based on a passenger who is on searchable probation. Considering "[t]he policy considerations articulated" in *Schmitz*, the court in *People v. Cervantes* (2017) 11 Cal.App.5th 860 (*Cervantes*) found an officer who pulled over a car with expired tags, and afterward learned the front passenger was on searchable probation, could lawfully search the backseat of the car. (*Id.* at pp. 862-863.) The court acknowledged, as did the *Schmitz* court, that search conditions for probationers and parolees are in some respects quite different. Quoting *Schmitz*, the court noted that " '[a] probationer explicitly agrees to being placed on probation,' whereas ' "parole is not a matter of choice." ' " (*Cervantes,* at p. 868.) But in the end, despite some differences

between the two, the court found "the similarities between parolees and probationers" warranted treating the two the same "in the context of vehicle searches." (*Id.* at p. 870.) It reasoned, similar to the *Schmitz* court, that drivers have a reduced expectation of privacy in the contents of their cars, and that the state has a substantial interest in monitoring probationers. (*Cervantes,* at pp. 870-871.)

b.      *Analysis*

With that background, we turn to defendant's arguments, starting with his objections to the search of his car.

Defendant first contends the *Schmitz* court's holding should not be extended to probationers. We disagree. Like *Cervantes*, we too find *Schmitz*'s holding is appropriately expanded to those on searchable probation. We acknowledge, as the *Schmitz* court mentioned, that " 'parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment.' [Citation.]" (*Schmitz*, *supra*, 55 Cal.4th at p. 921.) But even so, like *Cervantes*, we find the similarities between the two warrant similar treatment in this context.

Applying the *Schmitz* court's reasoning, we find two considerations in particular guide our decision. First, "the state has a substantial interest in monitoring probationers to prevent and detect recidivism." (*Cervantes*, *supra*, 11 Cal.App.5th at p. 871.) The court in *Schmitz* found that true of parolees because parolees " ' "are more likely to commit future criminal offenses," ' " "have an even greater 'incentive to conceal their criminal activities and quickly dispose of incriminating evidence than the ordinary criminal,' " and may be searched without a warrant. (*Schmitz*, *supra*, 55 Cal.4th at pp. 923-924.) But those same considerations also apply for probationers who have consented to be searched. Like parolees, these probationers are "more likely to engage in criminal conduct than an ordinary member of the community" (*United States v. Knights* (2001) 534 U.S. 112, 121), "have even more of an incentive to conceal their criminal activities

10

and quickly dispose of incriminating evidence than the ordinary criminal" (*id.* at p. 120), and may be searched without a warrant. Second, "[o]n the other side of the balance, as noted, a driver has a reduced expectation of privacy with regard to an automobile," and that expectation is "further diminished when he allows others to ride in his car, thus ceding some measure of privacy to them." (*Schmitz*, at p. 924.) In that regard, as the *Schmitz* court recognized, it is noteworthy that passengers in noncommercial cars—in our case, a minivan—typically have "ready access to areas in both the front and the back seats." (*Id.* at p. 925.)

Taking these considerations together, we find it appropriate to expand the *Schmitz* court's holding to those on searchable probation. We thus conclude an officer may search "those areas of the passenger compartment where the officer reasonably expects that the [probationer] could have stowed personal belongings or discarded items when aware of police activity." (*Schmitz*, *supra*, 55 Cal.4th at p. 913.) A narrower rule, to use the *Schmitz* court's words, would allow "a [probation] passenger [to] frustrate a valid [probation] search simply by sitting in the front seat of the car and placing or discarding his belongings in the back. Imposing such an artificially narrow rule frustrates the legitimate goals" in having probation search conditions. (*Id.* at p. 926.)

Defendant next contends the officer had no authority to search his car because "[t]here was no evidence that the vehicle belonged to Scarbrough," "no evidence that Scarbrough had any right to control [defendant's] vehicle," and no search term that allowed officers to search cars other than hers. But no evidence of this type existed in *Cervantes* either. Nor did it exist in *Schmitz*. Nonetheless, even absent evidence that the defendants in those cases owned or had a right to control the cars in which they were passengers, those courts still found the officers there could lawfully search "those areas of the passenger compartment where the officer[s] reasonably expect[ed] that the parolee [or probationer] could have stowed personal belongings or discarded items when aware of police activity." (*Schmitz*, *supra*, 55 Cal.4th at p. 913 [parolees]; *Cervantes*, *supra*, 11

11

Cal.App.5th at p. 871 [probationers]; see also *Schmitz*, at p. 919 [although "[t]here is good reason to limit a warrantless, suspicionless residential search to areas where an officer reasonably believes the parolee or probationer exercises 'common authority,' " that standard "is unworkable when applied to this parolee, who was a mere passenger in defendant's automobile"; "[h]omes and cars are afforded different levels of Fourth Amendment protection"].) We see no reason to find differently here.

Lastly, in term of the search of the car, defendant attempts to distinguish *Schmitz* and *Cervantes*. To that end, he notes that, unlike the probationer and parolee passengers in those cases, Scarbrough "ha[d] exited the vehicle before knowing about the police presence." But we find that detail insufficient to warrant reversal here. Even assuming Scarbrough was unaware of the officers' presence until after exiting, the trial court still found she had just left the car when the officers approached, "was still so close to the car" at that time, and "still had access to it." We find that factual finding, which defendant does not challenge, enough to reject his claim here. Again, our holding is that an officer may search those areas of a car's passenger compartment where the officer reasonably expects the probationer could have stowed or discarded items after noticing police activity. That searchable area includes those parts of the passenger compartment that the probationer "still had access to," even if the probationer had already stepped outside the car when she became aware of police activity. After all, a probationer who exits a car, but "still ha[s] access to it," very well could conceal items in the car after noticing police activity. (Cf. *Arizona v. Gant* (2009) 556 U.S. 332, 343 [an officer who arrests a recently removed passenger may still search the car incident to arrest "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search"].) We thus reject defendant's contention that the officer here had no authority to

12

search defendant's car, simply because Scarbrough was outside the car at the time the officers approached.[4]

Finally, defendant briefly contests the two other searches that occurred on December 17, 2012.

First, he contends the officer's search of his person was unlawful because it was "based upon the contraband discovered during the unlawful vehicle search." But because we reject defendant's challenge to the search of his car, we also reject defendant's related challenge to the search of his person.

Second, defendant asserts the officer's search of his and Scarbrough's motel room was also unlawful "because it was derived from the unlawful search of [defendant's person]." Because we reject defendant's challenge to the search of his person, however, we also reject this derivative challenge to the search of the motel room.

### 2.    *September 18, 2013 Searches*

We turn next to the court's denial of defendant's motion to suppress relating to the searches performed on September 18, 2013.

To briefly recap, after defendant was charged and arrested following the December 2012 searches, the trial court released him from custody on standard bail terms. But months later, in August of 2013, the court conditioned defendant's continued release on him agreeing to search conditions. (*Maxwell*, *supra*, C075314, C075315.) Defendant agreed to these terms, though under protest. (*Ibid.*) A month later, on

---

[4]    In his reply brief, defendant raises one additional argument. In his opening brief and motion to suppress, he contended the officer had no authority to search his car at all. But in his reply brief, he offers an alternative argument: even if the officer had some authority to search his car, the scope of the officer's search was unlawful (e.g., the officer should not have searched under the driver's seat). Because, however, defendant raises this argument for the first time in his reply brief, without good cause, we will not consider it. (See *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8.)

September 18, 2013, an officer relied on these search conditions to search defendant's person, car, and home—which later led to one of the charges here. But a year after these searches, we struck the search conditions. (*Ibid.*) We explained that "[r]equiring the accused to waive a constitutional right in order to qualify for bail must be justified—if justifiable—by some particularized need." (*Ibid.*) But, we found, no such particularized need had been demonstrated here. We thus "order[ed] the trial court to vacate the search conditions." (*Ibid.*)

Defendant's motion to suppress here concerns the effect of our 2014 *Maxwell* decision on the September 18, 2013 searches that preceded it. In his view, because these searches were premised on a bail condition that was later found invalid, all evidence obtained from these searches must be suppressed under the exclusionary rule. We disagree.

The exclusionary rule, when applicable, forbids the use of evidence obtained in violation of the Fourth Amendment's requirements. (*Davis v. United States* (2011) 564 U.S. 229, 236 (*Davis*).) But not all violations of the Fourth Amendment warrant application of this rule. "As with any remedial device, the rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served." (*Arizona v. Evans* (1995) 514 U.S. 1, 11 (*Evans*).) To that end, courts have applied the rule only when it would "yield 'appreciable deterrence' " and the benefits of suppression would "outweigh its heavy costs." (*Davis*, at p. 237.)

Based on these principles, the United States Supreme Court has several times declined to exclude unlawfully obtained evidence. It first did so in *United States v. Leon* (1984) 468 U.S. 897. The court there considered whether the exclusionary rule barred the use of evidence "obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause." (*Id.* at p. 900.) It found it did not based on three considerations. "First," the court explained, "the exclusionary rule is designed to deter

14

police misconduct rather than to punish the errors of judges and magistrates." (*Id.* at p. 916.) "Second," the court noted, "there exists no evidence suggesting that judges and magistrates are inclined to ignore or subvert the Fourth Amendment or that lawlessness among these actors requires application of the extreme sanction of exclusion." (*Ibid.*) "Third, and most important, [the court] discern[ed] no basis . . . for believing that exclusion of evidence seized pursuant to a warrant will have a significant deterrent effect on the issuing judge or magistrate." (*Ibid.*) The court thus declined to apply the exclusionary rule in the case before it, adopting, in the process, "a good-faith exception to searches conducted pursuant to warrants." (*Id.* at p. 924.)

The court has since "applied this 'good-faith' exception [to the exclusionary rule] across a range of cases." (*Davis*, *supra*, 564 U.S. at p. 238.) In *Illinois v. Krull* (1987) 480 U.S. 340, the court "extended the good-faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes." (*Davis*, at p. 239.) In *Evans*, the court "applied the good-faith exception in a case where the *police* reasonably relied on erroneous information concerning an arrest warrant in a database maintained by judicial employees." (*Davis*, at p. 239.) In *Herring v. United States* (2009) 555 U.S. 135, the court "extended *Evans* in a case where police employees erred in maintaining records in a warrant database," reasoning that " '[i]solated,' 'nonrecurring' police negligence . . . lacks the culpability required to justify the harsh sanction of exclusion." (*Davis*, at p. 239.) And in *Davis*, the court found the good-faith exception applied "when the police conduct a search in objectively reasonable reliance on binding judicial precedent." (*Ibid.*)

The question here is whether this good-faith exception should also apply when the police conduct a search in reliance on bail terms that were later found to have been improperly imposed. We find it should, at least on the facts here. "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.' [Citation.]" (*Davis*, *supra*, 564 U.S. at p. 240.) But neither of these

15

considerations favor exclusion here. The officer who conducted the search did not violate defendant's Fourth Amendment rights deliberately. Nor did he act recklessly or with gross negligence. He instead acted in good-faith reliance on defendant's then-extant bail terms. And, we find, this reliance was objectively reasonable.

Although, to be sure, we later set aside the search condition in the bail terms because the trial court did not sufficiently show those conditions were warranted (*Maxwell*, *supra*, C075314, C075315), the officer here had no reason to know the trial court's decision was insufficiently reasoned. (Cf. *Leon*, *supra*, 468 U.S. at p. 921 ["In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."].)

Nor did the officer have any other reason to find the search terms were unlawful. In defendant's view, the officer should have known that trial courts cannot constitutionally include search terms in bail orders. But whether courts can impose search terms in bail orders remains an open question—and one open to reasonable dispute. The California Supreme Court recently declined to decide that very issue, saying only for now that "courts have authority to impose reasonable conditions related to public safety on persons released on bail." (*In re Webb* (2019) 7 Cal.5th 270, 278; see also *id.* at pp. 271-272.) Under current law, then, we cannot say the officer here should have known the search terms in defendant's bail terms were invalid. We thus find defendant has not shown application of the exclusionary rule would result in the requisite " 'appreciable deterrence.' " (*Davis*, *supra*, 564 U.S. at p. 237.) And we accordingly reject his "attempt here to ' "[p]enaliz[e] the officer for the [trial court's] error." ' [Citation.]" (*Id.* at p. 241.)

B.     *Jury Instructions on Uncharged Offenses*

Defendant next takes issue with the trial court's instructing the jury about "uncharged offenses" using CALCRIM No. 375.

16

Before turning to his particular contentions, we start with a little background on the admissibility and use of "uncharged offenses"—that is, offenses that are discussed but not charged in the current case. Evidence Code section 1101, subdivision (a) generally bars admission of evidence of a defendant's other acts or offenses to prove the defendant's "conduct on a specified occasion." So, for example, a prosecutor seeking to persuade a jury that a defendant committed theft on one "specified occasion" generally cannot introduce evidence that the defendant was convicted of theft in the past. Evidence section 1101, subdivision (b), however, "provides a limited basis for admission" of this type of evidence. (*People v. Williams* (1988) 44 Cal.3d 883, 904.) As relevant here, it allows the introduction of a defendant's uncharged offenses "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, [or] absence of mistake or accident . . .) other than his or her disposition to commit such an act." (Evid. Code, § 1101, subd. (b).)

CALCRIM No. 375 instructs juries about how and when they may use evidence of uncharged offenses admitted under Evidence Code section 1101, subdivision (b). It instructs when a jury may consider evidence of a defendant's uncharged offenses: namely, "only if the People have proved by a preponderance of the evidence that the defendant in fact committed" the uncharged offenses. (See also *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1224, fn. 14.) And it further instructs how a jury may use this evidence: namely, as relevant here, a jury may consider this evidence only "for the limited purpose of deciding whether" "[t]he defendant was the person who committed the offenses alleged in this case," "the defendant acted with the [requisite] intent" to commit the crimes alleged in this case, "[t]he defendant had a motive to commit the offenses alleged in this case," the defendant had the requisite knowledge "when he allegedly acted in this case," the defendant's alleged actions were not "the result of mistake or accident," or "[t]he defendant had a plan or scheme to commit the offenses alleged in this case."

17

Turning to the facts here, at trial, the prosecution introduced evidence of one uncharged offense that it believed relevant to show, among other things, that defendant knew the heroin he possessed in December 2012 and November 2013 was in fact heroin. In particular, the prosecution introduced evidence showing defendant possessed a "large amount of heroin" in June of 2013, which was the subject of a separate case. Based on the admission of this evidence, the prosecution later sought a jury instruction under CALCRIM No. 375. Defendant objected to the request, though he offered no explanation for his objection. Facing only this unexplained objection, the trial court agreed to instruct the jury on CALCRIM No. 375 and ultimately did so.[5]

Defendant now, for the first time, offers two particularized objections to the court's instructions based on CALCRIM No. 375.

_____

[5] The court's instruction, in full, stated: "The People presented evidence that the defendant committed other offenses that were not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the offenses. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the offenses, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not: [¶] The defendant was the person who committed the offenses alleged in this case; or [¶] [t]he defendant acted with the intent to sell narcotics in this case; or [¶] [t]he defendant had a motive to commit the offenses alleged in this case; or [¶] [t]he defendant knew the substance was heroin when he allegedly acted in this case; or [¶] [t]he defendant's alleged actions were the result of mistake or accident; or [¶] [t]he defendant had a plan or scheme to commit the offenses alleged in this case. [¶] In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. [¶] Do not consider this evidence for any other purpose. [¶] If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of counts 1, 2, and 3. The People must still prove every charge beyond a reasonable doubt."

18

First, he asserts the court's instructions should have been more detailed. As he notes, the court admitted evidence of various uncharged offenses. One, as mentioned, concerned defendant's possession of a "large amount of heroin" in June of 2013, which was admitted to show identity, intent, motive, knowledge, absence of mistake, and common plan or scheme. But most of the introduced uncharged offenses concerned prior felony convictions that were admitted for impeachment purposes only. Because of the admission of these various uncharged offenses, defendant contends the court should have clarified that the instruction under CALCRIM No. 375 was concerned only with his possession of heroin in June of 2013, and not also with his prior convictions that were admitted only for impeachment purposes.

To begin, we agree a more detailed instruction would have been appropriate on these facts. As the California Supreme Court has explained in cases involving CALJIC No. 2.50, the predecessor to CALCRIM No. 375, "when evidence of a prior conviction has been admitted for impeachment purposes and other-crimes evidence also has been admitted pursuant to Evidence Code section 1101, subdivision (b), the trial court should instruct the jury as to which evidence is referred to in the CALJIC No. 2.50 instruction, in order to avoid confusion." (*People v. Catlin* (2001) 26 Cal.4th 81, 147.)

But even so, "we agree with the Attorney General that defendant has forfeited this claim by failing to ask the trial court to clarify the instruction of which he now complains." (*People v. O'Malley* (2016) 62 Cal.4th 944, 991.) The court in *O'Malley* considered a similar challenge involving CALJIC No. 2.50—again, the predecessor to CALCRIM No. 375. The defendant there, like defendant here, argued the trial court's instruction on uncharged offenses should have been clarified to avoid jury confusion, though for a slightly different reason. While defendant here contends the court should have clarified that only one of the *uncharged* offenses was relevant to the instruction under CALCRIM No. 375, the defendant in *O'Malley* contended the court should have clarified that only one of the *charged* offenses was relevant to the instruction under

19

CALJIC No. 2.50. In particular, the defendant there asserted the trial court should have clarified that the admitted uncharged offense was only relevant to show his intent to commit one, not two, of the charged crimes. (*O'Malley,* at pp. 990-991.) But because the defendant failed to raise the issue at trial, the court found it forfeited. (*Ibid.*) For similar reasons, we find defendant forfeited his claim here. To use the *O'Malley* court's words, "all parties clearly understood that the uncharged crimes evidence, and therefore the instructions on that point, pertained solely to [defendant's possession of heroin in June of 2013], not to the [convictions that were introduced for impeachment purposes]. Had defendant wished, he could have sought to make that explicit in the instructions, but he failed to seek such clarification. Accordingly, the claim is forfeited." (*Ibid.*)

Although defendant offers several arguments to counter a forfeiture finding, we find none persuasive. First, he claims we should not find forfeiture because he objected to the trial court's instruction under CALCRIM No. 375. But all defendant said was the following: "For the record, I object." A bare objection of that sort does not sufficiently inform the trial court of the need for a clarifying instruction. Defendant next asserts that, even if he failed to adequately object at trial, he could still raise this claim on appeal because the instructional error affected his substantial rights. We disagree here too. It is true that "[i]n general, a defendant may raise for the first time on appeal instructional error affecting his or her substantial rights." (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428; § 1259.) "But '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.' [Citation.]" (*Buenrostro*, at p. 428.) And that is precisely what defendant is attempting to do here. We find his claim forfeited as a result.

Finally, defendant contends the court's instruction under CALCRIM No. 375 was flawed because it slightly strayed from the standard instructions. As defendant notes, the court's instructions twice referred to "offenses" when the standard instructions refer to "uncharged offenses." It did so first in the opening lines of the instruction, stating: "The

20

People presented evidence that the defendant committed other offenses that were not charged in this case. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the *offenses*." And it did so again later in the instruction, stating: "If you decide that the defendant committed the *offenses*, you may, but are not required to, consider that evidence for" certain limited purposes. In the standard instructions, these italicized parts refer instead to "uncharged offense[s]/act[s]." According to defendant, these differences constitute reversible error "because they had the effect of lowering the prosecution's beyond-a-reasonable doubt burden of proof . . . as to the charged drug offenses."

We disagree. To start, defendant never objected to the instruction on this ground, raising another potential forfeiture issue. But even if this claim were not forfeited, we would find any error the court committed was harmless. The court's instructions were clear that its references to "offenses" were references to "offenses that were not charged in this case" (i.e., uncharged offenses). For example, consider again the opening lines of the court's instruction. "The People presented evidence that the defendant committed *other offenses that were not charged in this case*. [¶] You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the *offenses*." Considering the use of the word "offenses" in this context, it is plain the instruction's reference to "offenses" in the second sentence was a reference to the types of offenses just mentioned—that is, "offenses that were not charged in this case." Other parts of the instruction further emphasize this point. The instruction's final paragraph, for example, instructs the jury that "[i]f you conclude that the defendant committed the *uncharged offenses*, that conclusion is only one factor to consider along with all the other evidence." This final paragraph thus clarifies, to the extent it was not clear already, the types of offenses being discussed in this instruction—uncharged offenses. Considering the instructions as a whole, as we must, we find no potential prejudice resulted from the court's two references to "offenses," rather than "uncharged

21

offenses." (See *People v. Chavez* (1985) 39 Cal.3d 823, 830 [in reviewing alleged error in jury instructions, courts look to the instructions as a whole].)

C.     *Sentencing Enhancements*

Finally, defendant asserts the trial court wrongly imposed several sentencing enhancements—specifically, the "on bail" enhancement under section 12022.1 and the prior prison term enhancements under section 667.5, subdivision (b).

1.     *"On Bail" Enhancement*

We consider first defendant's objection to the on-bail enhancement imposed under section 12022.1.

Section 12022.1, as relevant here, imposes a penalty enhancement for those who are released on bail following a felony charge (the "primary offense") and then, while out on bail, commit another felony (the "secondary offense").[6]  The trial court's application of section 12022.1 in this case was a straightforward one:  Defendant had been released on bail on a "primary" felony offense (for possessing heroin with the intent to sell in December 2012) and then, while out on bail, committed a "secondary" felony offense (by possessing heroin with the intent to sell in November 2013).

Defendant, however, contests the application of section 12202.1 here.  Because we struck some of the bail terms of his "primary offense" in *Maxwell*, he claims there was no "lawful bail order" in place at the time he committed the "secondary offense."

_____

[6]     Section 12022.1, subdivision (b) provides:  "Any person arrested for a secondary offense that was alleged to have been committed while that person was released from custody on a primary offense shall be subject to a penalty enhancement of an additional two years, which shall be served consecutive to any other term imposed by the court."  Subdivision (a) of the statute defines a "primary offense" to mean "a felony offense for which a person has been released from custody on bail or on his or her own recognizance prior to the judgment becoming final . . . ," and a "secondary offense" to mean "a felony offense alleged to have been committed while the person is released from custody for a primary offense."

We disagree. Defendant was still out "on bail" at the time he committed the "secondary offense," even if one of his bail conditions at that time was improper. Nothing in *Maxwell* suggests otherwise. We may have found it necessary to modify the trial court's bail conditions in that case (*Maxwell*, *supra*, C075314, C075315), but we never suggested the court erred in releasing defendant from custody on bail. We thus find no merit to his claim here.

## 2. *Prior Prison Term Enhancement*

We consider next defendant's objection to the prior prison term enhancements premised on section 667.5, subdivision (b).

At the time of sentencing, section 667.5 required courts that were sentencing a defendant to prison on a "new offense" to impose an additional year in prison if the defendant " '(1) was previously convicted of a felony; (2) was imprisoned as a result of that conviction; (3) completed that term of imprisonment; and (4) did not remain free for five years of both prison custody and the commission of a new offense resulting in a felony conviction.' [Citation.]" (*People v. Buycks* (2018) 5 Cal.5th 857, 889 (*Buycks*).)[7]

_____

[7] Section 667.5 provided the following enhancement for nonviolent prison priors at the time of sentencing: "[W]here the new offense is any felony for which a prison sentence or a sentence of imprisonment in a county jail under subdivision (h) of Section 1170 is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended for any felony; provided that no additional term shall be imposed under this subdivision for any prison term or county jail term imposed under subdivision (h) of Section 1170 or when sentence is not suspended prior to a period of five years in which the defendant remained free of both the commission of an offense which results in a felony conviction, and prison custody or the imposition of a term of jail custody imposed under subdivision (h) of Section 1170 or any felony sentence that is not suspended." (Stats. 2014, ch. 442, § 10.) The Legislature, however, recently amended section 667.5, subdivision (b) to limit application of this sentencing enhancement. No longer does it apply for all nonviolent prison priors. It instead now applies only for prison priors for

Based on these requirements, the trial court here sentenced defendant to an additional year in prison, on both counts 1 and 3, because he had served a prior prison term following a 2005 conviction.[8]

As defendant notes, however, one of the necessary elements for imposing a prior prison term enhancement is a previous felony conviction, and the relevant conviction here—a 2005 conviction under Health and Safety Code section 11350—had been reduced to a misdemeanor under Proposition 47 before sentencing in this case.

Proposition 47 "amended portions of the Health and Safety Code and the Penal Code to reclassify certain drug possession and theft-related offenses from felonies or wobblers to misdemeanors, with limited exceptions for those offenders having certain prior convictions that are not relevant [here]." (*Buycks*, *supra*, 5 Cal.5th at p. 877.) One of those offenses was Health and Safety Code section 11350, which prohibits the possession of certain drugs. Once either a felony or a misdemeanor, violations of that statute are now generally misdemeanors under Proposition 47. (See *People v. Rivera* (2015) 233 Cal.App.4th 1085, 1092.) Although these prospective changes have little relevance here, Proposition 47 also offers retroactive relief. Relevant here, it permits those who had already served a felony sentence for violating Health and Safety Code section 11350 to petition to have their felony conviction deemed a misdemeanor going forward. (§ 1170.18, subds. (f)-(g).) And that is what defendant did here. He petitioned to have his 2005 conviction under Health and Safety Code section 11350 reduced to a misdemeanor. And, before sentencing in this case, the trial court granted defendant's petition.

---

"sexually violent offense[s] as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code." (Stats. 2019, ch. 590, § 1.)

[8] Although the court imposed the enhancement on both counts 1 and 3, it afterward stayed execution of the enhancement on count 3.

Because defendant successfully redesignated his 2005 conviction to a misdemeanor before sentencing in this case, the trial court should have treated this conviction as a misdemeanor. (§ 1170.18, subd. (k) [a felony conviction that is "designated as a misdemeanor under subdivision (g) shall be considered a misdemeanor for all purposes," with limited exceptions relating to firearms].) But instead it treated the conviction as a felony and, as a result, found this conviction triggered the sentencing enhancement in section 667.5, subdivision (b) for counts 1 and 3. It erred in doing so. (See *Buycks*, *supra*, 5 Cal.5th at p. 889 ["the resentencing of a prior underlying felony conviction to a misdemeanor conviction negates an element required to support a section 667.5 one-year enhancement"].) We thus strike the one-year enhancements on both these counts.

## DISPOSITION

The judgment is modified to strike the section 667.5 one-year enhancement on counts 1 and 3. The trial court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

/s/
BLEASE, J.

We concur:

/s/
RAYE, P. J.

/s/
MURRAY, J.

25